

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-21-2001

# Armour v. Beaver

Precedential or Non-Precedential:

Docket 00-3431

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Armour v. Beaver" (2001). *2001 Decisions.* Paper 273.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/273

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 21, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3431

DELORES ARMOUR, Appellant

v.

THE COUNTY OF BEAVER, PENNSYLVANIA, BEA
SCHULTE, COMMISSIONER, in her individual capacity

On Appeal From the United States District Court
For the Western District of Pennsylvania
Chief District Judge: Hon. Donald E. Ziegler
D.C. No. 99-cv-00669

Argued: December 12, 2000

Before: SCIRICA and AMBRO, Circuit Judges, and
POLLAK, District Judge.*

(Filed: November 21, 2001)

Samuel J. Cordes (Argued)
Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222

Attorneys for Appellant

_____

* The Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Neva L. Stanger (Argued)
Campbell, Durrant & Beatty
555 Grant Street, Suite 120
Pittsburgh, PA 15219

Attorneys for Appellees

OPINION OF THE COURT

POLLAK, District Judge.

In this case, plaintiff-appellant Delores Armour claims that her First Amendment rights were violated when she was fired from her position as secretary to defendant-appellee Bea Schulte, then a County Commissioner of defendant-appellee Beaver County, Pennsylvania ("the County"). Armour contends that she was terminated because of her political beliefs, and hence that her termination contravened the general rule against political patronage dismissals established in Elrod v. Burns, 427 U.S. 347 (1976) and Branti v. Finkel, 445 U.S. 507 (1980). The District Court granted summary judgment in favor of the County and Schulte, on the ground that the County and Schulte had satisfied the burden of establishing that political affiliation was an appropriate requirement for the secretarial position. Additionally, the District Court found, sua sponte, that appellant had failed to adduce sufficient evidence to enable a fact-finder to infer that her termination was politically motivated--i.e., to infer that, as Armour contended, Schulte decided to terminate her based on the perception that Armour was supporting a candidate other than the one backed by Schulte in a campaign for a local judgeship.

For the reasons that follow, we reverse.

I. Factual and Procedural Overview

Armour and Schulte met when Armour volunteered to work on Schulte's 1995 campaign as a Democratic candidate for the office of County Commissioner. Armour was one of a number of people working on Schulte's campaign. As part of her involvement in the campaign,

2

Armour attended campaign committee meetings, traveled with Schulte to polling locations and political functions, attended fund-raising events, and placed Schulte's signs throughout the voting district. After winning the election, Schulte offered to hire Armour as her secretary. Armour accepted and began her employment as Schulte's secretary in January 1996. According to Armour's deposition testimony, once hired, she relinquished her political role and turned her attention to the clerical tasks of the job, at least during work hours. Armour testified that she spent approximately half of her time working for Schulte and that, in the balance of her time, Armour--like the other commissioners' secretaries--performed clerical tasks under the supervision of the Chief Clerk of the County. Armour testified that in January, 1999, Joseph Askar, a Democrat seeking election to a local judgeship, approached her with logistical questions about running a campaign; she answered Askar's questions but took no other action on his behalf. The parties agree that in early February Schulte learned of Armour's contact with Askar--who was running against the Democratic candidate supported by Schulte and the local party establishment--and questioned Armour about her involvement with Askar's campaign.

At about the same time, Armour proposed that the County create a human service coordinator position and hire her for the position. Schulte testified that she raised the possibility with the other commissioners and that they decided against creating the position. Instead, in late February, 1999, Schulte offered Armour a part-time clerical position at a geriatric center earning a lower salary and asked Armour to go home and think about the offer. 1 The next day Armour took a personal day off. The testimony of Schulte and Armour indicates that, on February 26, when Armour was next in the office, Schulte asked Armour whether she had made a decision about taking the geriatric center position. Schulte testified that "[Armour] told me that I would have to speak to her attorney." Armour testified that she told Schulte that "if [Schulte] had some

_____

1. Schulte testified that she did not know at the time that the position was part-time; however, Armour testified that she, Armour, was aware that the position was part-time when it was offered.

3

work for me to do I'd be more than happy to go back to her office, but if it was about the job offer, I was requesting she wait until my attorney was present to discuss it." App. at 77 (Armour Dep. at 101). The parties are in agreement that Schulte then advised Armour that she was terminated.

Armour filed suit under 42 U.S.C. S 1983 in the United States District Court for the Western District of Pennsylvania against the County and also against Schulte in her individual capacity. The County and Schulte moved for summary judgment on the ground that political affiliation was an appropriate job requirement for the position of secretary to a Beaver County Commissioner. In their summary judgment motion, appellees acknowledged that the question whether Armour was fired based on her political affiliation "involve[s] disputes over issues of material fact best left for trial." The District Court granted summary judgment in favor of Schulte and the County based both on the appropriateness of a political-affiliation job requirement and on the lack of evidence that Armour's political affiliation was the cause of her termination.

II Standard of Review

We exercise plenary review of the District Court's decision to grant summary judgment. See Assaf v. Fields , 178 F.3d 170, 171 (3d Cir.), cert. denied, 528 U.S. 951 (1999). In doing so, we must apply the same test that the district court must apply. See Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.)(en banc), cert. denied , 483 U.S. 1052 (1987). Reviewing the record as a whole, we will "draw all reasonable inferences in favor of the non-moving party" and will not weigh the evidence or make credibility determinations. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). If it appears that "there is no genuine issue as to any material fact" and the movant is entitled to judgment at a matter of law, we will affirm a grant of summary judgment. Fed. R. Civ. P. 56(c).  Of course, we will give credence to " `evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.' " Reeves, 530 U.S. at 151 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 300 (1986)).

4

In lawsuits such as the present one, in which the plaintiff is a government employee raising a First Amendment political discharge claim, the usual standard of review for grants of summary judgment is modified in that it is up to the defendant government employer to prove that political affiliation is an appropriate requirement for the job. "Since . . . it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification" rests with the government employer. Elrod, 427 U.S. at 368. Moreover, in Zold v. Township of Mantua, 935 F.2d 633 (3d Cir. 1991), we invoked the principle that, when the First Amendment is implicated, appellate courts have a special responsibility to undertake an exacting review of the whole record with a particularly close focus on facts that are determinative of a constitutional right. Id. at 636 (citing New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964) and New Jersey Citizen Action v. Edison Township, 797 F.2d 1250, 1259 (3d Cir. 1986)).

III Review of the Record

Before undertaking an analysis of the legal issues presented on this appeal, we will set forth (1) the principal record evidence regarding the nature of Armour's secretarial position, (2) the principal record evidence regarding the reason or reasons for Armour's termination, and (3) the District Court's rationale for granting summary judgment in favor of appellees.

A. The Nature of the Secretarial Position

None of the parties contends that Armour was a policy-maker in her position as secretary to Schulte. But the parties disagree as to the level of confidentiality, loyalty, and political trust required in the position. There are three Beaver County Commissioners. At the time in question, there were two Democrats--Commissioner Schulte and Commissioner Dan Donatella--and one Republican--Commissioner Nancy Loxley. Joann Clarke was Donatella's secretary and Jo Johnson was Loxley's secretary.2 According to the testimony of Donatella,

_____

2. Clarke and Johnson were both hired by previous commissioners and then retained by Donatella and Loxley, respectively.

5

although as a formal matter all three commissioners had joint authority over personnel decisions regarding the commissioners' secretaries, it was understood among the commissioners that each commissioner had the power to hire and fire his or her own secretary.

The three secretaries shared the same office space and, depending on availability, they would perform routine tasks for any one of the commissioners. Armour testified that she devoted fifty to sixty percent of her time to performing work for the Chief Clerk. Clarke testified that tasks assigned to her by the Chief Clerk filled approximately sixty percent of her working hours. In working for the Chief Clerk and in working for the commissioners, the secretaries spent the bulk of their time performing such clerical tasks as typing correspondence, resolutions and motions; answering phones; greeting and directing visitors to the office; handling paperwork; opening mail; making photocopies; making travel arrangements; scheduling meetings; filing documents; directing checks to the proper departments; and obtaining signatures. Armour also scheduled the board meetings which required the presence of the entire board, made photocopies of all mail received that was relevant to the entire board, and took minutes at public board meetings when Johnson was not available to do so. Additionally, she attended monthly meetings of the Aliquippa Family Preservation Network ("AFPN") in Schulte's stead. At these meetings she took notes and voted as Schulte's proxy. In testimony, Armour described her role at those meetings as follows:

> [I]t was not a real important board, they didn't really deal with a lot of issues other than trying to get themselves established and there were things that would have to be voted on, like paying the bills, this person going to conference or whatever. I didn't sit in on the executive board and have privy to the decision making, but the regular minutes, if it called for a vote, yes.

App. at 69 (Armour Dep. at 48). As to Armour's participation in the AFPN meetings, Schulte testified: "[A]t the time I didn't realize that she had the power to vote, but I found out later that she was, indeed, voting in my stead."

6

App. at 54 (Schulte Dep. at 21). Armour maintained in her deposition testimony that, although she did not end her own political involvement, she stopped accompanying Schulte to political functions at the close of the 1995 campaign. Also, Armour testified that none of the secretaries was privy to personnel matters or files; the testimony of Clarke and Johnson is not to the contrary.3

In 1996, Armour suggested that a position of office manager for the commissioners be created and that she be appointed to the position. Schulte testified that she proposed this to the other commissioners but that they were not in favor of the idea. App. at 56 (Schulte Dep. at 31)("I'm sure they did not want to have their secretaries subject to my secretary."). In 1997, the commissioners decided to create an executive administrative position directly under the commissioners and on par with the Chief Clerk. In her testimony, Schulte emphasized that the person in the executive administrative position, as that position was envisioned, would have performed "strictly executive administrative-type duties and . . . represent the commissioners." The position was created and funded but never filled because, according to Schulte's testimony, the commissioners could not decide on who should be hired. Moreover, it seems that Armour was not seriously considered for this position because the commissioners had decided that a college degree--which Armour did not have--was a requirement for the job. Schulte testified:

> Delores' husband called me and wanted to know why we had included a requirement for a college degree for that position, because that eliminated Delores from consideration. . . . I told him that I included--had included that requirement, because this person would, indeed, be representing the three commissioners, and we felt that was a necessary--all the commissioners had agreed that would be a necessary requirement.

App. at 56 (Schulte Dep. at 32).
_____

3. However, when enumerating his secretary's duties in deposition testimony, Donatella mentioned that his secretary had some involvement in payroll.

7

On March 11, 1998, Armour completed a document entitled "Class Specification Review & Comment". Directions for completing the form stated, in pertinent part:

> Please review the attached classification specification to make sure it accurately describes the body of work you perform. Please note that in many cases, it will not identify every task that you specifically perform. When you see the words: May perform other duties, including work in other functional areas this means that within the list of duties you should find the essential duties that you regularly perform.
>
> If you believe some essential duties have been omitted, or a part of the specification is inaccurate; please indicate this below.

App. at 93 (emphasis in original).

Appellant typed the following response on the space provided:

> Although this job may appear secretarial in nature, a large portion of the duties fall more towards administrative assistant. The high level of confidentiality and responsibility reaches far beyond the desk, often into our personal lives. A broad background in County government is essential for even the entry level of this position.

Id.

The form was signed by Armour and initialed by Schulte. In deposition testimony, Armour explained this statement by saying: "[T]he concept I was trying to get across was what I thought the job should be more so than what the job actually is." Asked whether she viewed her position as a confidential position, Armour testified: "I viewed it as a secretary. Of course all secretaries have some confidence to their boss, regardless of their position." App. at 69 (Armour Dep. at 49). Asked if she would describe the position as requiring a high degree of confidentiality, Armour responded, "I would say normal." Id.

Armour's description of the position in her deposition testimony stands in some tension with the statements of

8

other witnesses. Schulte testified that Armour was privy to confidential material through her access to lists of resolutions and motions from commissioners' meetings, correspondence among commissioners, Schulte's telephone calls, and her personal calendar. Schulte also testified that Armour "would often talk to department heads setting up meetings and explaining the purpose of the meeting. That was a very important part of her function. If she didn't understand the purpose of the meeting, then she couldn't explain it, and often the meetings were involving confidential matters." App. at 54 (Schulte Dep. at 21-22).

When asked to describe the secretarial position, Donatella testified as follows:

> The secretary obviously in that capacity works very close with the county commissioner whom she's affiliated with because of the fact that you need a good close relationship. As a matter of fact, I do believe that they were classified as confidential secretaries and not come under the realm of the union, because each commissioner was at liberty to select that particular employee because of the relationship that they needed to maintain.

App. at 44 (Donatella Dep. at 6).

Donatella also testified, with respect to the duties that his secretary performed:

> She does everything from answering the telephone for me to doing confidential letters, even sometimes arranging meetings. Doing not only my clerical work, but frankly, operating as my eyes and ears, both political and otherwise. She helps me even on the political end of it, arranging for different political functions and so forth.

Id. (Donatella Dep. at 6-7). There may, however, be room for more than one interpretation of Donatella's testimony regarding the nature of the secretarial position. For example, Donatella testified:

> [B]asically, they do everything that any other confidential secretary would do as far as even running the office side is concerned. They do resolutions, they

9

get signatures, payroll, act as receptionist, they do typing and all the other secretarial skills that's required.

Id.

Asked to explain what he meant when he said the secretaries "do resolutions," Donatella clarified his testimony by stating that the resolutions are prepared by the law department and the secretaries' responsibilities are limited to (a) ensuring that the commissioners sign the completed resolutions and (b) mailing the resolutions to the proper places.

When Donatella was asked whether political affiliation was required for a commissioner's secretary, he testified:

Well, I don't know if it's a requirement, no; but mainly, it is associated with that because on the campaign trail, usually those people are directly or indirectly involved in the campaign, helping that individual to be elected. But I have seen where sometimes someone is selected that is not involved in the campaign. . . . It's whomever that commissioner feels comfortable with I think is the bottom line. They have to be capable of doing the job at hand, and it always helps to be politically astute, obviously.

Id. at 45 (Donatella Dep. at 9). Amplifying the connection between politics and the secretarial position, Donatella explained:

[G]enerally, if a Republican is a commissioner, they are going to hire a Republican secretary and the other way around. I don't know of any case where it was other than that. I do [not] remember a Democrat hiring a Republican or vice versa, at least to my knowledge in the 35 years I was there. They are generally the same party, if that's the question.

Id. (Donatella Dep. at 10).

The testimony of Johnson, secretary to Commissioner Loxley, reinforces appellees' argument that Armour's position required a significant level of confidentiality: "The work that I do for Nancy [Loxley] I would consider to be of

10

a confidential nature, not so much the general work that I do for [the Chief Clerk] . . ." App. at 85 (Johnson Dep. at 36). With respect to her work for Loxley, Johnson testified: "[I]t's a political atmosphere here, and Nancy would often times talk to me in confidence about political issues, party issues that I would have to keep to myself and not be able to share with anybody else." Id. However, portions of Johnson's testimony indicate some question as to the substance behind her more general assertions regarding the nature of the job. Asked whether there were any other sources of confidential information beyond the above referenced conversations with Loxley, such as letters or phone calls, Johnson testified: "No. Her correspondence that she got in typically, unless it was something political in nature, if it was county related, all three commissioners would get the same correspondence." Id. Additionally, Johnson testified that she had not been questioned about her political affiliation during her interview for the position, that she did not consider herself a political adviser, and that her political affiliation did not play any role in her ability to keep information confidential. Johnson also provided an affidavit in which she stated that Armour used to identify herself as Schulte's "confidential secretary" when she answered the phone. However, Armour denied having so identified herself.

Clarke, Donatella's secretary, testified that "my responsibility, of course, is to represent [Donatella] and to keep all confidentiality". App. at 89 (Clarke Dep. at 9). Clarke's testimony brings into focus the seeming ambiguity of the term "represent" as used by the parties and witnesses. Asked about her participation in active campaigning, Clarke testified that she served as Donatella's campaign treasurer (usually performing these tasks during evening and weekend hours) and would assist Donatella with his campaign at his request: "I represent Commissioner Donatella mainly when I am anywhere politically. I'm there basically to assist him, if that's--you know, if I am to represent him at a function or if I am to be there just to be, you know, part of the event." App. at 91 (Clarke Dep. at 34). Additional questions on this topic resulted in the following exchange:

11

Q: Do you consider yourself to be a political advisor to [Donatella]?

A: Inform him of happenings or go in his behalf? I don't understand.

Q: Do you advise him on policies for the county?

A: No.

Q: But you occasionally go to functions on his behalf?

A: Not for him. Basically, I will go part of.

Q: Do you go to tell him what happened at the functions, or what do you mean?

A: No, I don't, I go just to represent him, be present, that if -- there may be five or six events going on in one evening, and so he's represented.

. . .

Q: Okay. Do you give speeches or anything of that nature at those kinds of functions?

A: No.

Id. (Clarke Dep. at 34-35).

B. The Reason for Armour's Termination

We now turn to the evidence in the record regarding the reason for Armour's termination.

Armour contends that rumors of her involvement with Joseph Askar's campaign for District Justice in Centre Township motivated Schulte to fire her. It is undisputed that Schulte was aware of such rumors. According to Armour's testimony, in January 1999, while Armour was still employed as Schulte's secretary, Askar, a Democrat, approached Armour with questions about the mechanics of conducting his campaign. Armour contends, and appellees do not dispute, that she merely answered Askar's questions on topics such as how many signs were required to cover a certain voting district. It appears to be undisputed that Schulte was told in early February, 1999 that Armour intended to support Askar instead of Joseph Zupsic, the Democratic candidate supported by Schulte. Donatella

12

testified that he and Schulte were present at a rally when someone told Donatella "that I'd better find Bea Schulte because Joe Schaffer, the town chair, was extremely upset because allegedly Dee [Armour] was working for Joe Askar." App. at 47 (Donatella Dep. at 20). Donatella testified further:

> So I went and found Bea and I said, "Bea, there's a problem, I think you better go talk to Mr. Schaffer because he is saying that your employee is working for Joe Askar." So I escorted her over to Mr. Schaffer and Mr. Zupsic, who was the other candidate, and they confronted her with and accused her that Dee [Armour], her employee, was working for Mr. Zupsic's opposition. Bea's comment in my presence was that she would find out about what was going on, she was not aware of that but she would talk to Dee.

Id. It is undisputed that on one occasion early in February of 1999, Schulte did question Armour about her involvement in Askar's campaign. Armour testified that Schulte called her into Schulte's office and said:"I'm getting flak over you supporting Joe Askar." App. at 70 (Armour Dep. at 53). According to Armour, Schulte asked a number of questions about Armour's involvement with Askar's campaign. For example, Armour testified that Schulte asked her whether she was holding "coffee klatches"--small grass-roots meetings to introduce a candidate to voters--for Askar, and that in reply she had explained that she was not involved in Askar's campaign but had answered some simple questions. Later that day, Armour approached Schulte and told her that she was upset about being questioned about what she did in her personal time. Some two to three weeks later, on February 26, 1999, Schulte discharged Armour.

Despite his acknowledgment that there was concern regarding Armour's possible involvement with Askar's campaign, Donatella testified that he was not under the impression that Armour's termination was related to her perceived support of Askar, nor had he heard rumors that Armour lost her job for that reason. Rather, Donatella testified that he attributed Armour's termination to a deterioration of the relationship between Armour and

13

Schulte that, according to Donatella, had begun approximately six months prior to Armour's termination.

C. The District Court's Opinion

With the foregoing synopsis of the record in view, we turn to the District Court's ruling granting summary judgment in favor of Schulte and the County. The District Court made the following assessment of Armour's testimony about the nature of her position:

> Plaintiff completed [the March 11, 1998] job description [in which she described the position as entailing a "high level of confidentiality"] before any alleged problems between herself and Schulte. We thus consider her deposition testimony [in which she described the position as entailing a "normal" level of confidentiality] as contradictory and her unbiased statement regarding her job duties as provided in March 1998 as more significant. See, e.g., Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 705–06 (3d Cir. 1988)(permissible for district court to disregard subsequent contradictory affidavit for purposes of determining whether there was a material dispute of fact).

Mem. Op. at 10.

The District Court proceeded to hold that appellees had carried their burden of establishing that political affiliation was properly required for the secretarial position:

> We find that plaintiff's party affiliation was an appropriate requirement for the effective performance of the job. See [Ness v. Marshall, 660 F.2d 517, 521 (3d Cir. 1981)]; [Brown v. Trench, 787 F.2d 167, 170 (3d Cir. 1986)]; Waskovich v. Morgano, 2 F.3d 1292, 1303 (3d Cir. 1993); Roseman v. County of Cambria, 862 F.Supp. 19, 21 (W.D. Pa. 1993); see also Williams v. City of River Rouge, 909 F.2d 151, 153 n.4 (6th Cir. 1990)(political affiliation is more than party politics, it is about trust, confidence, and sharing a common viewpoint with those to whom authority is delegated). Plaintiff acted as liaison between department heads and Schulte, which required knowledge of confidential

14

matters. She also had access to correspondence containing party issues and confidential material. Commissioner Donatella noted the importance of loyalty and the necessity of a close relationship between the commissioner and secretary. Johnson described the office as a political atmosphere, and Clarke acknowledged that she "represents" Commissioner Donatella at political events.

Plaintiff testified that she responded to constituent calls and handled the matter before involving Schulte. Each time plaintiff responded to a concern of a constituent, she was representing Schulte in a political nature. See, e.g., Brown, 787 F.2d at 170 (while some of [plaintiff's] duties were only technical or clerical in nature, her principal duty was to act as spokesman for the Commissioners). It is likely that Democratic constituents who seek redress from their Democratic commissioner, or simply express concerns of a political nature, expect that the commissioners' secretary shares their political ideology. In other words, Democratic constituents should find comfort in expressing their concerns to the commissioner's secretary, whom the voters felt would express or relay the issues accurately and compassionately to the commissioner. In essence, plaintiff was a conduit between the Democratic constituents and Commissioner Schulte, their elected representative. See Waskovich, 2 F.3d at 1299–1300, quoting Hall v. Ford, 856 F.2d 255, 263 (D.C. Cir. 1988)("high level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superior's policies, and perceived by the public as sharing their superiors' aims").

Plaintiff attended meetings on behalf of Schulte, voted in her stead, and attended political functions with the Commissioner. Her own job description elevated the position to one of "administrative assistant." Based on the evidence of record, we find that an absence of political cohesion would undermine the working relationship between plaintiff and Schulte. Cf. Burns v. County of Cambria, Pennsylvania, 971 F.2d 1015,

15

> 1022–23 (3d Cir. 1992). We find that defendants have established that political affiliation is an appropriate job requirement for plaintiff's position.

Mem. Op. at 10-12.4

Additionally, the District Court held that Armour did not establish the causation elements of the test set forth in Robertson v. Fiore, 62 F.3d 596, 599 (3d Cir. 1995)(plaintiff must prove "that the employee maintained an affiliation with a party" and "that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision"). First, the District Court held that Armour's actual political affiliation with Askar was insufficient to meet the Robertson test because that connection "was minor." Mem. Op. at 13. Second, the District Court held that Armour's argument that her " `perceived' political affiliation with Askar's campaign was a substantial or motivating factor in Schulte's decision to terminate her" was "without merit" because Schulte questioned Armour about her involvement with Askar's campaign on only one occasion. Id. Finally, the District Court credited testimony of Donatella and Schulte that indicated that Armour was fired because her relationship with Schulte had deteriorated independently of any tensions that were caused by Armour's perceived connection with Joseph Askar.

III Discussion

First, we will consider whether, as the District Court held, the record on appellees' motion for summary judgment mandated a finding that political affiliation was an appropriate requirement for Armour's job. Second, we will consider whether, as the District Court held sua sponte, appellees were entitled to summary judgment on the alternate ground that Armour had failed to present any significant evidence that her firing was attributable to political affiliation.

_____

4. Armour testified that she did not accompany Schulte to political functions once she was hired as Schulte's secretary.

16

## A. Armour's Job

At least at one time--namely, during Schulte's 1995 campaign--Delores Armour's relationship with Bea Schulte could have been characterized as political in nature. It is less clear that Armour's position as secretary to Schulte required a shared political purpose. The question before this court is whether defendants have established, beyond factual dispute, that political agreement was an appropriate requirement for the position of secretary to a Beaver County Commissioner.

Adverse employment actions against government employees that are based on political affiliation are, as a general rule, prohibited. See O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996); Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976). In Elrod, a plurality of the Court first announced this rule based on the recognition that political patronage dismissals run counter to the First Amendment rights of free speech and political association. See Elrod, 427 U.S. at 359. At the same time, the Court delineated a narrowly drawn exception for particular positions for which political affiliation is found to be an appropriate requirement. Applying the intermediate "exacting" level of scrutiny, the Court explained: "The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." Id. at 362; see Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 395 (3d Cir. 1998). The notion of what constitutes a position for which political affiliation may acceptably be required has developed over time. In Elrod, the Court adopted an approach that distinguished between policymaking and non-policymaking positions. Reiterating the rule in his concurrence, Justice Stewart advised that political affiliation could not provide a basis for adverse actions taken against a "nonpolicymaking, nonconfidential government employee". Id. at 375 (Stewart, J., concurring). The Court described the inquiry into the nature of the responsibilities and the function of a given position as particularly fact-specific. Id. at 367-68.

17

In Branti, the Court revised the Elrod test to lessen the emphasis on determinations of whether a position entails policymaking and confidentiality: "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518. Justice Stevens, speaking for the Court, stated: "Under some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character." Id. at 518 (providing an example of a scenario in which "a State's election laws require that precincts be supervised by two election judges of different parties"). He continued: "It is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position." Id. (giving the example of a football coach for a state university).

> On the other hand, it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.

Id. The Branti Court also reiterated that in order for a patronage dismissal to pass constitutional muster, it must forward a governmental purpose:

> The plurality [in Elrod] emphasized that patronage dismissals could be justified only if they advanced a governmental, rather than a partisan, interest. 427 U.S., at 362. That standard clearly was not met to the extent that employees were expected to perform extracurricular activities for the party, or were being rewarded for past services to the party. Government funds, which are collected from taxpayers of all parties on a nonpolitical basis, cannot be expended for the benefit of one political party simply because that party has control of the government.

Branti, 445 U.S. at 517 n.12. The requirement of a governmental purpose to support political patronage

18

reflects the core holding of Elrod and Branti that a long tradition of political patronage cannot, in itself, immunize politically motivated dismissals from scrutiny.

We have had numerous occasions to apply these principles. In Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386 (3d Cir. 1998), we charted the development of Third Circuit case law interpreting the Elrod /Branti test. The Boyle court canvassed Ness v. Marshall, 660 F.2d 517, 521 (3d Cir. 1981)(adopting a "functional analysis" under which a dismissal was permissible where a difference in party affiliation would "be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office"), Brown v. Trench, 787 F.2d 167, 168 (3d Cir. 1986)(refining the Elrod/ Branti test by focusing the inquiry on "whether the employee has meaningful input into decision making concerning the nature and scope of a major [governmental] program")(internal quotation marks omitted), and Zold, 935 F.2d at 636 (synthesizing prior decisions and holding that appellate courts are obligated to "make an independent examination of the whole record" with "special scrutiny").

We noted in Boyle, 139 F.3d at 396, that because the Elrod/Branti test is flexible and entails an extremely fact-intensive inquiry, cases such as the case at bar resist easy generalizations. In the case at bar, we must determine whether the District Court's grant of summary judgment was correct as to the appellant--a nonpolicymaking, secretary-clerk serving in roughly equal parts an elective county executive (County Commissioner) and a non-elective county administrator (Chief Clerk). Unsurprisingly, none of our prior cases carries us effortlessly to a resolution; however, we find particular guidance in Brown and Zold.

Brown arose from the dismissal of a county assistant director of public information. In that case, we discussed the difficulty of determining the appropriateness of political-affiliation requirements for jobs that entail clerical tasks:

> While Branti provides us with a "test" the Supreme
> Court has not specified the particular factors which
> indicate that a position falls within the Branti test.
> Factors suggested by other courts include whether the

19

employee's duties are simply clerical or related to law enforcement, nondiscretionary or technical. Courts have also considered whether the employee participates in Council discussions or other meetings, whether the employee prepares budgets, or has authority to hire or fire employees, the salary of the employee, and the employee's power to control others and to speak in the name of policymakers. In Crisp [v. Bond, 536 F.Supp. 137, 139 (W.D. Mo. 1982)], the Court held that the Assistant Director of the Division of Motor Vehicle and Drivers Licensing could not be fired because he had no confidential duties even though he supervised employees, prepared the budget, was liaison with the public, attended conferences, and analyzed administrative procedures and work standards. The key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility but whether the employee has "meaningful input into decision making concerning the nature and scope of a major township program."

Brown, 787 F.2d at 169-70 (citations omitted). In Brown, we concluded: "While some of [Brown's] duties were only technical or clerical in nature, her principal duty was to act as spokesman for the Commissioners and help promote county projects. Brown could, therefore, be dismissed because of her political affiliation without any violation of her first amendment rights." Id. at 170.

In Zold, a deputy township clerk challenged her politically motivated dismissal. We reversed the district court's grant of summary judgment in favor of the township and remanded the case for further proceedings. We observed that the district court appeared to rely on three job functions in finding that political affiliation was a proper job requirement for the deputy clerk position: (1) secretary of the Township Committee, in which capacity the deputy clerk could have access to confidential information during closed sessions; (2) liaison officer between government officials and taxpayers and between the executive and the general body of municipal personnel; and (3) public relations figure. See Zold, 935 F.2d at 637. We distinguished the public relations work performed by Zold

20

from that conducted by the appellant in Brown based on the fact that Zold was not responsible for writing press releases and speeches of elected officials, or for promoting county projects, or for acting as spokesperson for the county commissioners before the press and public. See id. at 638. Instead, we reasoned:

> Her contact with the press is generally limited to informing reporters about the agenda of upcoming meetings, and her contact with the public is, as the district court put it, "receiving inquiries and complaints from the electorate and responding in kind," 737 F.Supp. at 317, rather than promoting policies. Therefore, Brown does not provide a basis to conclude that the deputy clerk's political affiliation is a job requirement.

Id. (citations omitted).

Additionally, we found that the deputy clerk's access to confidential material did not justify a political affiliation job requirement; however this holding was narrowly tailored to the circumstances of Zold:

> Arguably, even though there is no evidence that the clerk or the deputy clerk acts as anything other than a functionary during the closed Committee meetings, the access to confidential information which may be discussed on these occasions might signify that political affiliation, translated in this case into loyalty to the majority party, is a job requirement. Nor do we deny that there is some sensitivity and discretion which must be exercised when the deputy clerk is acting as a liaison or as a spokesman. However, these factors cannot serve to demonstrate the need for party affiliation because virtually all of these functions are duties that the deputy assumes from the clerk. State law makes clear that political affiliation is not a factor in the municipal clerk's position.

Id. at 638. Hence, we stated that "we cannot conclude that duties fulfilled by a tenured, nonpolitical appointee suddenly become confidential or political on those occasions when the deputy clerk is called to substitute for him." Id.

21

Finally, we observed:

> The defendants have expressed concern that an
> employee whose tasks include contact with the public
> could deliberately harm the government's (and thereby
> the dominant party's) image in the public eye; one who
> must provide information to government officials
> perhaps could deliberately undermine policy decisions
> or administrative efficacy. However, any government
> employee, including those with the most routine
> clerical tasks, could injure the employer's efficiency or
> public image. A receptionist could put callers on hold
> and neglect to answer or forward their inquiries; an
> office clerk could misfile forms, deliberately delay their
> processing, and treat visitors rudely. The obvious
> response is that employees who engage in such
> behavior can be discharged on the basis of their poor
> job performance. The potential that an employee may
> cause havoc is in itself no basis for holding the
> employee can be hired or discharged because of his or
> her political affiliation.

Id. at 639.

In the present case, the District Court found, at the close
of discovery, that there were no remaining material issues
of fact as to whether political affiliation was an appropriate
requirement for Armour's position. As we explain in the
paragraphs which follow, our review of the record yields a
different conclusion.

We highlight certain factual disputes that we find
unsusceptible to resolution at the summary judgment
stage. First, we note that the District Court undertook to
weigh the credibility and relative significance of Armour's
March 11, 1998 written comments about her job
description and her subsequent deposition testimony on
the subject. Specifically, the District Court characterized
Armour's deposition testimony as "contradictory and her
unbiased statement regarding her job duties as provided in
March 1998 as more significant." We think such weighing
should have been reserved for the fact-finder.5

_____

5. The District Court relied on Martin v. Merrell Dow Pharmaceuticals,
Inc., 851 F.2d 703 (3d Cir. 1988) as support for its authority to assess

22

In the same vein, we do not agree with the District Court that Clarke's testimony that she "represented" Donatella supports summary judgment. The theme of representation was addressed in the testimony of a number of witnesses; however, the content of the testimony on the concept of representation of the commissioners is less than clear. Whereas Clarke testified that she "represented" Donatella at political events, a reasonable fact-finder might conclude that the representation of which she spoke entailed little more than her presence at certain events rather than active participation as a spokesperson ("I go just to represent him, be present"). For her part, Armour testified that it was not part of her job to represent Schulte at political events. Armour's role at the AFPN meetings--she attended in Schulte's stead but Schulte only became aware that Armour voted at the meetings after the fact--might also be

_____

the credibility of the later deposition testimony. We find the District Court's reliance on Martin to be misplaced. In Videon Chevrolet, Inc. v. General Motors Corporation, 992 F.2d 482 (3d Cir. 1993), we distinguished a situation in which a party gave ambiguous deposition testimony from the situation in Martin and emphasized that the Martin court had articulated a rule applicable only in extreme circumstances:

> In Martin, the mother of a child born with birth defects made eight sworn factual statements tending to negate liability on the part of the defendant drug manufacturer. Later, facing an almost certain loss on summary judgment, she submitted a flatly contradictory affidavit which contained no explanation for her change in position.
> We held that on those clear and extreme facts the district court could properly ignore the later affidavit.

Videon Chevrolet, Inc., 992 F.2d at 488. See also Farrell v. Planters Lifesavers Company, 206 F.3d 271 (3d Cir. 2000).

Unlike Martin, in the present case appellant did provide what a fact-finder might regard as a plausible explanation for the differences between her 1998 written comments about the nature of the secretarial position and her subsequent deposition testimony about the degree of political involvement, confidentiality, and responsibility required ("[T]he concept I was trying to get across was what I thought the job should be more so than what the job actually is."). A fact-finder might not only have accepted the explanation but gone on to credit the deposition testimony of appellant that the District Court declined to give equivalent weight to.

23

interpreted to support more than one inference regarding the level of representation inherent in the position.

Further, Armour contends that the fact that the commissioners created a new administrative position above the secretaries, though they never filled that position, would lend support to a finding that the secretarial positions did not entail the level of confidentiality or require the type of representation of the commissioners that would make political affiliation a proper job requirement. Specifically, Schulte testified that the never-filled executive administrator position required a college degree because the person in that position "would, indeed, be representing the three commissioners." Of course, the fact that the administrative position was created would not compel a fact-finder to conclude that the work of the secretaries and the work of the potential administrator would not have overlapped in any respect. However, the creation of the administrative position and the adoption of more demanding requirements for it than for a secretarial position might lead a fact-finder to doubt that a secretarial position was one for which political affiliation was a proper ingredient.

Finally, we note that the secretaries' contact with constituents, relied on by the District Court in its summary judgment ruling, also fails to bear the weight of the government's burden on the appropriateness of a political-affiliation requirement. It is undisputed that Armour and the other secretaries responded to constituent calls and, when possible, handled constituents' requests without involving the commissioners. We are, however, unpersuaded that the fact that the secretaries would attempt to handle constituents' requests on their own ineluctably leads to the conclusion that political affiliation was an appropriate requirement for the job. See Zold, 935 F.2d at 638 (employee's contact with the public limited to receiving and responding to inquiries and complaints rather than promoting policies did not support a political-affiliation requirement).

Neither the County nor Schulte contends that this case implicates the central question in most political patronage cases--whether an employee had "meaningful input into

24

decision making." Brown, 787 F.2d at 170. Instead, appellees rely on evidence that Armour was entrusted with access to confidential information as part of her job and that a lack of political loyalty would interfere with the performance of her duties. We have, indeed, acknowledged that access to confidential information may support a political-affiliation job requirement even in the absence of a decision-making function. See Zold, 935 F.2d at 638-39. However, we have also cautioned against an over reliance on the factors of confidentiality and loyalty: "Although loyalty and confidentiality of sheriff's deputies are desirable attributes, those traits are needed for many working relationships. It has never been suggested that the need for loyalty and confidentiality alone supports politically motivated dismissals independent of the tasks which the employee must perform." Burns v. County of Cambria, 971 F.2d 1015, 1023 (3d Cir.), cert. denied, 506 U.S. 1081 (1993). Here we are faced with the question whether being the personal secretary to a county commissioner is, without more, sufficient evidence to establish as a matter of law that political affiliation is an appropriate job requirement. There is case law that points in this direction. For example, in Faughender v. City of North Olmsted, 927 F.2d 909, 914 (6th Cir. 1991), the Sixth Circuit stated: "Viewed in its functional aspect, a mayor's secretary is clearly the type of position that involves access to confidential and political material, and political loyalty, whether partisan or personal, is an essential attribute of the job." But the fact-specific approach embraced by this court in Brown and Zold and other cases is not in harmony with such a categorical rule.

Armour's "access to confidential information . . . might signify that political affiliation . . . is a job requirement." Zold, 935 F.2d at 638. However, on the record before us, we are unable to so conclude without weighing the evidence--a task that we leave for the fact-finder. If a jury were to credit Armour's testimony, and indeed a good deal of the testimony of Donatella and Johnson, it could find that the job duties of the commissioner's secretary were more analogous to "the most routine clerical tasks," id. at 639, than to tasks involving a high level of confidentiality.

Thus, based on our review of the record, we conclude

25

that, under Fed. R. Civ. P. 56(c), genuine disputes regarding the nature of Armour's position remain. This conclusion is strengthened in that, as mentioned above, the "substantial" burden of proving that political affiliation is an appropriate job requirement remains at all times on the governmental entity or official seeking to justify the adverse employment action. See Burns, 971 F.2d at 1022.6

## B. The Sua Sponte Ruling That Armour Was Not Fired for Political Reasons

We turn now to the District Court's alternative basis for granting summary judgment--namely, that Armour failed to come forward with evidence linking her termination to her perceived political affiliation.

In order to prevail on a First Amendment claim of discrimination, a public employee must prove "that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision." Robertson v. Fiore, 62 F.3d 596, 599 (3d Cir. 1995). In this

_____

6. Our dissenting colleague observes that "[w]e have previously declared summary judgment appropriate in political dismissal cases, depending, of course, on the facts. Boyle, 139 F.3d at 397; Ness, 660 F.2d at 522. This is such a case."

Ness is authority for the proposition that"[w]here, as a matter of law, a person is determined to have occupied a policymaking position, that person's claims to protection from patronage dismissal under Elrod and Branti are disposable on a motion for summary judgment." Id. What was said in Ness must, of course, be read in the context of the Supreme Court's recital in Branti "that party affiliation is not necessarily relevant
to every policymaking or confidential position." 445 U.S. at 518. We do not understand the dissent to contend that Armour's position could properly be characterized as "policymaking." On the other hand, there is certainly evidence of record that some of Armour's responsibilities were "confidential." However, the record does not compel the inference that, as a matter of law, the totality, or even the bulk, of Armour's responsibilities were "confidential." Accordingly, determining whether the defendants, on whom the burden rests, have been able to establish that Armour's job falls outside the protections of Elrod and Branti is a matter for the factfinder, not for the District Court on summary judgment. As we noted in Boyle, "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the factfinder." 139 F.3d at 393.

26

case, appellees had submitted a summary judgment motion to the District Court that was directed at the appropriateness of requiring political affiliation in the secretarial position. In that summary judgment motion appellees acknowledged that the issue of whether Armour's firing was politically motivated "involve[s] disputes over issues of material fact best left for trial." Nevertheless, when ruling on the parties' motions, the District Court sua sponte addressed the issue of why Armour was fired.

We need not reach the merits of the District Court's sua sponte disposition of the causation issue because the District Court did not, prior to its ruling, notify the parties that the issue would be addressed. Our holding in Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903 (3d Cir. 1994), is controlling. In Otis Elevator Co., "[t]he district court not only denied [defendant's] motion for summary judgment with respect to count IV, it granted summary judgment for [plaintiff] with respect to that count, sua sponte." Id. at 909. We noted that even though the district court's decision was "understandable given the state of the record," "it nonetheless constituted error under Rule 56 of the Federal Rules of Civil Procedure," and, accordingly, we vacated the order. Id. at 910.

Thus, we cannot sustain the District Court's sua sponte ruling that appellant failed to adduce facts that would support an inference that she was fired on the basis of her political affiliation.

III Conclusion

Because we conclude that there are material issues of fact for the fact-finder and because the District Court did not provide notice to the parties that it would reach the question of causation on summary judgment, the order of the District Court granting summary judgment in favor of appellees is reversed. The case is remanded to the District Court for further proceedings consistent with this opinion.

27

SCIRICA, Circuit Judge, dissenting.

Throughout most of Pennsylvania's counties, the county commissioners constitute both the executive and the legislative branch of government, "generally regulating the affairs of the county." 16 Pa. Cons. Stat. S 509(a) (1955).1 As such, the commissioners are the chief political and governmental authorities, exercising all the corporate powers of the county. Id. S 512. With respect to county affairs, commissioners have long been vested with vast discretionary powers. Kistler v. Carbon County , 35 A.2d 733, 739 (Pa. Super. Ct. 1944).

Despite their many governmental duties, Beaver County Commissioners employ only one secretary apiece. Because of the manifold demands placed on County Commissioner Bea Schulte, her secretary, Dolores Armour, performed many tasks requiring confidentiality and high levels of responsibility. With significant political and administrative duties, Armour functioned as more than a clerical secretary. Armour was an integral component of the commissioner's office, helping Schulte to serve her constituents effectively.

In Elrod v. Burns, the Supreme Court held a political employee who "acts as an advisor or formulates plans for the implementation of broad goals" may be dismissed because of her political beliefs without violating the First Amendment. 427 U.S. 347, 368 (1976) (Brennan, J., plurality opinion). The Court also noted that "[n]o clear line can be drawn between policymaking and nonpolicymaking

_____

1. This is true in counties of the Third to Eighth Classes, comprising sixty-two of Pennsylvania's sixty-seven counties. Philadelphia is Pennsylvania's only First Class county, with more than 1,500,000 inhabitants (1,585,577 in the last census). Allegheny is a Second Class county, with a population between 800,000 and 1,500,000 inhabitants (1,336,449). There are three Second Class A counties, with populations ranging from 500,000 to 800,000 inhabitants: Montgomery (678,111), Delaware (547,651), and Bucks (541,174). Beaver is a Fourth Class county, with a population between 150,000 and 225,000 inhabitants (186,093). In counties from the Third to Eighth Classes, excepting home-rule counties, the executive and legislative officers are the county commissioners.

positions" and that "[t]he nature of the[employee's] responsibilities is critical." Id. at 367. Four years later, in Branti v. Finkel, the Supreme Court stated the ultimate "question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the performance of the public office involved," taking into account the "vital interest in maintaining governmental effectiveness and efficiency." 445 U.S. 507, 517–18 (1980).

Recent cases have clarified how courts should determine whether the dismissal of political-patronage employees, like Dolores Armour, pass constitutional muster. This "functional analysis" may turn, for example, on whether a difference in political affiliation between employer and employee will be "highly likely to cause an official to be ineffective in carrying out" the official's duties. Ness v. Marshall, 660 F.2d 517, 521 (3d Cir. 1981) (finding city solicitors' party affiliations relevant to the performance of their responsibilities). If so, the employee's dismissal does not violate the First Amendment.2 Of course, as the District Court here observed, "the constitutional limitations on political patronage extend to intraparty political disputes as well as interparty political disputes." Opinion at 3 (citing Robertson v. Fiore, 62 F.3d 596, 601–02 (3d Cir. 1995)).

As the majority acknowledges, "access to confidential information may support a political-affiliation job requirement even in the absence of a decision-making function." Supra at 25 (citing Zold v. Township of Mantua, 935 F.2d 633, 638–39 (3d Cir. 1991)). Given the sensitive correspondence, resolutions, telephone messages, and partisan material arriving in the commissioner's office each day, Commissioner Schulte needed a loyal lieutenant. If Armour's political loyalties diverged from her employer's, it would appear that she should not be constitutionally protected against dismissal from her confidential post.

_____

2. See, e.g., Boyle v. County of Allegheny Pa., 139 F.3d 386, 396 (3d Cir. 1998); Wetzel v. Tucker, 139 F.3d 380, 384 (3d Cir. 1998); Waskovich v. Morgano, 2 F.3d 1292, 1297 (3d Cir. 1993). A similar test was employed by the Court of Appeals for the Sixth Circuit in a case the majority cites for support of a "categorical rule," Faughender v. City of North Olmstead, 927 F.2d 909, 914 (6th Cir. 1991). Faughender  was also an appeal from summary judgment.

29

The majority properly refuses to "overrel[y]" on Armour's access to confidential information. But the testimony unmistakably demonstrated more than Armour's access to confidential information. It also proved that Armour performed administrative and political tasks requiring discretion and judgment. Armour served as Schulte's private secretary and administrative assistant from January 1996 through February 1999. During that period, she attended meetings of the Aliquippa Family Preservation Network on Schulte's behalf, sometimes voting her proxy. Whenever possible, Armour answered constituents' requests herself. Armour also attended political functions and fundraisers with Schulte, testifying these events were designed "to get [Schulte's] name out." Furthermore, Armour acted as the liaison between Schulte and department heads. Admitting that her duties required political acumen, Armour testified "[t]he high level of confidentiality and responsibility reaches far beyond the desk, often into our personal lives." Armour also conceded that political affiliation was an appropriate requirement for her position and that she would never have been hired had she not actively supported Schulte's 1996 successful campaign for office.3 As the District Court noted:

> Each time [Armour] responded to a concern of a constituent, she was representing Schulte in a political nature. It is likely that Democratic constituents who seek redress from their Democratic commissioner, or simply express concerns of a political nature, expect that the commissioner's secretary shares their political ideology. In other words, Democratic constituents should find comfort in expressing their concerns to the commissioner's secretary, whom the voters felt would express or relay the issues accurately and compassionately to the commissioner.

_____

3. Armour became involved in Schulte's campaign for county commissioner when Schulte's husband, a Pennsylvania district justice, asked Armour to assist his wife. Armour testified she did "[w]hatever was asked" in the campaign, including attending organizational meetings and functions, driving Schulte to the polling places, and posting Schulte's signs throughout the county. After Schulte's election, the commissioner-elect asked Armour to serve as her secretary, which Armour immediately accepted. Armour began working the day Schulte took her oath of office.

Opinion at 11-12.

In addition to this evidence, the District Court considered testimony from others regarding the role of commissioners' secretaries. Beaver County Commissioner Dan Donatella declared his secretary "operates as his eyes and ears, both politically and otherwise." Jo Johnson, secretary to Beaver County Commissioner Nancy Loxley, testified her position required political loyalty because Loxley discussed in confidence political as well as party issues. Both Johnson and Joan Clarke, secretary to Commissioner Donatella, described their jobs as "political." Clarke testified that she represented Commissioner Donatella "when I am anywhere politically."

In light of their duties, the Beaver County Commissioners' secretaries functioned as political and governmental assistants. Cf. Branti, 445 U.S. at 517. Other Courts of Appeals have repeatedly concluded policymakers' assistants' jobs are not protected by the First Amendment.4 The District Court correctly reached the same result in this case.

Armour's duties were constitutionally indistinguishable from those of a mayor's secretary. As the Court of Appeals for the Sixth Circuit held, "Viewed in its functional aspect, a mayor's secretary is clearly the type of position that involves access to confidential and political material, and political loyalty . . . is an essential attribute of the job." Faughender, 927 F.2d at 914. It is difficult to imagine that the Mayor of Philadelphia or Pittsburgh, or the President of

_____

4. E.g., Baker v. Hadley, 167 F.3d 1014, 1019 (6th Cir. 1999) (upholding dismissal of employees in county auditor's office where the auditor intended the positions to be "confidential, policymaking jobs for which political affiliation was an appropriate requirement"); Soderstrum v. Town of Grand Isle, 925 F.2d 135, 140-41 (5th Cir. 1991) (finding a police chief's secretary was a "confidential employee," based in part on a "realistic understanding of the confidential relationship between secretaries and their bosses"); Savage v. Gorski, 850 F.2d 64, 68 (2d Cir. 1988) (noting political affiliation is "an appropriate requirement when there is a rational connection between shared ideology and job performance"); Santiago-Correa v. Hernandez-Colon, 835 F.2d 395, 397 (1st Cir. 1987) (observing political officials may fire "'confidential' employees, like personal secretaries" because of "political affiliation").

their City Councils, would be unable to employ a secretary who was not politically loyal.5 County commissioners in Fourth Class counties, representing the executive and legislative branches of government, must have at least as much right as mayors to employ secretaries who further the commissioners' political and governmental agendas.

Nevertheless, the majority finds summary judgment inappropriate because of conflicting evidence whether a commissioner's secretary is "clerical" in nature. Supra at 25. As we noted in Zold, "When the issue on appeal turns on a constitutional fact . . . appellate courts have the obligation to give such facts special scrutiny. . . . An appellate court in such instances may draw its own inference from facts in the record." 935 F.2d at 636. I see no outstanding issues that require factual resolution. That the District Court must apply a functional, case-specific test does not render summary judgment inapplicable. We have previously declared summary judgment appropriate in political-dismissal cases, depending, of course, on the facts. Boyle, 139 F.3d at 397; Ness, 660 F.2d at 522. This is such a case.

Applying the same test as the District Court, I find no "genuine issue of material fact," FED . R. CIV. P. 56(c), after affording the non-moving party all "reasonable inferences," Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). Nor do I find "reasonable" an inference that Armour's duties were primarily clerical. An officeholder's "clerical" employees do not vote her proxies, resolve constituents' requests, or have access to the office's most sensitive and confidential political and governmental information, as did Armour. The District Court held,"In essence, plaintiff was a conduit between the Democratic constituents and Commissioner Schulte, their elected representative." Opinion at 12.

---

5. As noted in Faughender, "A mayor's secretary must undertake those functions in relation to the flow of information, whether by writing, speech, or personal visit, to and from the mayor's office, that the mayor wants the secretary to perform. A particular secretary's duties may be circumscribed, but the function of the office is constant." 927 F.2d at 913-14.

6. I would also affirm the District Court's alternative holding -- that Armour did not demonstrate her support of Joseph Askar for a local judgeship was a "substantial or motivating factor" in her termination. Opinion at 12-14. The evidence demonstrated Schulte only questioned Armour once about her involvement with Askar, and Armour denied any "direct" involvement with Askar's campaign. With no other evidentiary support, Armour did not meet her burden of proving that her political affiliations led to her dismissal.

The majority frames the issue as whether summary judgment was appropriate, given Armour was a "nonpolicymaking, secretary-clerk serving in roughly equal parts an elective county executive (County Commissioner) and a non-elective county administrator (Chief Clerk)." Supra at 19. I do not read the court's opinion as an attempt to segregate Armour's duties between the "political" and the "nonpolitical." Of course, were that the standard, "political" employees in state or municipal government would be virtually nonexistent. Necessity demands the staffs of elected officials perform several tasks -- governmental, political, administrative, and clerical. Clerical duties, even if they are "roughly equal" to more specialized obligations, do not render those employees "nonpolitical."

The District Court found that an "absence of political cohesion" between Armour and Schulte would potentially damage the commissioner's work, rendering Armour an employee subject to dismissal on political grounds. Opinion at 12, quoted supra at 14-16. Having reviewed the record, I would agree.[6]

Because I would affirm the judgment of the District Court, I respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit