

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-2007

# Galli v. NJ Meadowlands Comm

Precedential or Non-Precedential: Precedential

Docket No. 05-4114

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Galli v. NJ Meadowlands Comm" (2007). *2007 Decisions.* Paper 835.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/835

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-4114

_____

ANNE GALLI,

Appellant

v.

NEW JERSEY MEADOWLANDS COMMISSION;
SUSAN BASS LEVIN, in her official
and individual capacities

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 03-cv-01237)
District Judge: Honorable Joseph A. Greenaway

_____

Argued December 4, 2006

Before: RENDELL and AMBRO, <u>Circuit Judges</u>
BAYLSON,[*] <u>District Judge</u>

(Opinion filed: June 20, 2007)

Kevin Kiernan, Esquire (Argued)
Kiernan & Campbell
206 Claremont Avenue
Montclair, NJ  07042
        Counsel for Appellant

William F. Maderer, Esquire
Sean R. Kelly, Esquire (Argued)
Bryan P. Schroeder, Esquire
Saiber, Schlesinger, Satz & Goldstein
One Gateway Center
Suite 1300
Newark, NJ 07102-5311

        Counsel for Appellee
        New Jersey Meadowlands Commission

Zulima V. Farber
   Attorney General of New Jersey
Michele A. Daitz
   Deputy Attorney General
Jane A. Greenfogel, Esquire (Argued)
Office of Attorney General of New Jersey

---

[*]Honorable Michael M. Baylson, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ   08625

Counsel for Appellee
Susan Bass Levin

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

An apolitical government employee appeals a grant of summary judgment rejecting her claim that she was fired in violation of her First Amendment rights because she failed to support the administration or political party in power.  We hold that First Amendment rights to freedom of speech and association protect government employees who lack a political affiliation from political patronage discrimination. We therefore vacate the District Court's grant of summary judgment and remand for application of this legal standard.

## I.      Factual Background and Procedural History

Anne Galli filed a political patronage discrimination claim against the New Jersey Meadowlands Commission ("Commission") and its Chair, Susan Bass Levin.  Galli alleges that she was unlawfully terminated from her position with the Commission because she was neither an active Democrat nor a

supporter of then newly elected Democratic Governor James McGreevey.

Galli holds degrees in biology, environmental science, and ecology, and has worked as a naturalist and professor of ornithology. She was hired to serve on the Commission in 1984 during the Republican administration of Governor Thomas Kean. At the time of her termination in 2002, she was the Commission's Director of Environmental Education, earning more than $100,000 annually. During her tenure, Galli claims that she was not registered with a political party and kept her lack of political affiliation private. Galli never shared her political views with her supervisor and was not asked to participate in any partisan political activity.

The Commission—whose charge includes environmental protection, economic development, and solid waste management—is an affiliate of the New Jersey Department of Community Affairs and is governed by a seven-member Board. The Board appoints an Executive Director, who runs the Commission day-to-day. Following Governor McGreevey's election in November 2001, Levin was appointed as the Director of the Department of Community Affairs, and she installed herself as head of the Commission soon thereafter. In July 2002, Robert Ceberio was appointed Executive Director of the Commission.

The Commission has a detailed manual outlining its

4

employee personnel policies.  It specifies that three Commission Board members, who comprise the "Personnel Committee," are charged with supervision of personnel matters.  With respect to terminations due to "problematic" performance, a written performance improvement plan must be conducted, the termination must be in writing, and the terminated employee must be granted the opportunity for a hearing.  Finally, creation of new jobs must be reviewed by the Board.

In March 2002, Executive Director Ceberio met with newly appointed Commissioner Levin to discuss operations and personnel changes.  As a result of that meeting, in April 2002 Galli and ten other employees of the Commission—all of whom had been hired during Republican administrations—were fired.  A few days prior, Ceberio met with Galli to inform her that she would be terminated.  According to Galli, Ceberio stated that she was being fired because the Commission was going in a "different direction"; however, he made no reference to either poor job performance or a Commission-wide reorganization, the two reasons later given by the Commission for Galli's termination.  Immediately following this meeting, Galli telephoned Commissioner Eleanore Nissley, a Republican who was serving as Vice Chair of the Commission at the time.  According to Galli, Nissley acknowledged that the Commission was "letting Republicans go," and stated by way of explanation that "some Democrat [obviously] wants the spot" and that one

5

has to "pay to play with this administration."[1] Galli claims that the Commission's personnel policies with respect to termination were not followed in her case.

Although the eleven employees (including Galli) purportedly were fired as part of a "reorganization" to make the Commission more efficient and cost-effective, it hired *eighteen* new employees in the year following these terminations. Galli contends that the eighteen new hires were almost all political patrons of the Democratic administration. She also alleges that many of these new hires were unqualified and extensively connected to the administration or the Democratic Party. In particular, she notes that her replacement, Linda Mercurio, formerly was a tax attorney with no background in environmental science or education. Galli asserts that Mercurio had strong ties to the Democratic Party establishment, having previously run for office twice on the Democratic ticket, which Galli believes explains Mercurio's hiring. Galli, on the other hand, had never before received negative feedback from her superiors, and, in fact, helped the Environmental Education Division earn an award of excellence that was bestowed shortly after she was fired.

In February 2003, Galli filed a complaint under 42 U.S.C.

---

[1]Although Nissley denies making this statement, for the purpose of summary judgment, we view the evidence in the light most favorable to Galli.

§ 1983 against both the Commission and Levin in the United States District Court for the District of New Jersey, alleging that her termination amounted to political patronage discrimination in violation of her First Amendment rights. The Commission and Levin responded by filing motions for summary judgment. In August 2005, the District Court granted these motions and dismissed Galli's complaint, holding that Galli could not establish that she had engaged in constitutionally protected activity because she was unaffiliated with any political party and disinclined to be active politically. In addition, the Court held that the Commission had no knowledge of Galli's political affiliation or lack thereof; thus political considerations could not have motivated her termination.

Galli appeals to us, arguing that the rights to freedom of speech and association guaranteed by the First Amendment protect employees like her (who lack political affiliation) from political patronage discrimination.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction in this case under 28 U.S.C. § 1331, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Our review of a District Court's grant of summary judgment is plenary. *See, e.g.*, *Slagle v. County of Clarion*, 435 F.3d 262, 263 (3d Cir. 2006). A grant of summary judgment is

proper when the moving party has established that there is no genuine dispute of material fact and that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court should view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial. *See* Fed. R. Civ. P. 56(e). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh*, 418 F.3d at 267 (citing *Anderson*, 477 U.S. at 251).

Finally, where the First Amendment is involved, we "undertake exacting review of the whole record with a particularly close focus on facts that are determinative of a constitutional right." *Armour v. County of Beaver, Pa.*, 271 F.3d 417, 420 (3d Cir. 2001) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)).

## III.    Discussion

### A.    Political Patronage Discrimination

Political patronage is a practice "as old as the American Republic." *Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 394 (3d Cir. 1998).  However, the Supreme Court has set limits to its use, emphasizing that "[t]o the victor belong only those spoils that may be constitutionally obtained."  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990).

The Court first clarified these constitutional constraints in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), holding that termination of public employees because of their political affiliation violates the First Amendment unless the position at issue involves policymaking. *See Elrod*, 427 U.S. at 359, 373 (concluding that conditioning public employment on support for the political party in power "unquestionably inhibits protected belief and association"); *Branti*, 445 U.S. at 513–17.  In general, "an employee's exercise of First Amendment rights outweighs the government's interest in maintaining a system of political patronage." *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997) (citing *Elrod*, 427 U.S. at 372–73, and *Branti*, 445 U.S. 514–15).  The exception for "policymaking" jobs exists because political loyalty is essential to the position itself. *Boyle*, 139 F.3d at 394.  In *Rutan*, the Court extended the *Elrod-Branti* doctrine, holding that the First Amendment protects public employees not only from

9

politically motivated discharge, but also from promotion, transfer, recalls, and other hiring decisions conditioned on political affiliation, unless the government can demonstrate that party affiliation is a proper requirement for the position. 497 U.S. at 75.

From these general principles, we have derived a three-part test to establish a claim of discrimination based on political patronage in violation of the First Amendment. To make out a *prima facie* case, Galli must show that (1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision. *See, e.g.*, *Stephens*, 122 F.3d at 176. Once she makes this demonstration, the Commission[2] may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Id.*; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). We discuss each of these matters separately.

---

[2] For the purposes of our analysis, we consider the claim against Levin, in both her official and personal capacities, together with the claim against the Commission, as both depend on the *prima facie* case that was dismissed by the District Court.

B.      Analysis

1.      *Political Affiliation as a Job Requirement*

As just noted, Galli must first show that she works in a position that does not require political affiliation.  This burden of proof shifts to the government if it claims to have properly discharged an employee because political affiliation is central to the job itself.  *See, e.g.*, *Armour*, 271 F.3d at 420.

While permitted political patronage lies in a gray area, employers are allowed to make employment decisions based on political affiliation when "policymaking" positions are at issue; however, "[n]o clear line can be drawn between policymaking and nonpolicymaking positions."  *Elrod*, 427 U.S. at 367.  In *Brown v. Trench*, our Court clarified this line by setting out several factors that should be considered when determining whether political affiliation is an appropriate precondition for a government position.  787 F.2d 167, 169 (3d Cir. 1986).  These factors include whether the employee has duties that are non-discretionary or non-technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire and fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers.  *Id.*  The "key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility[,] but whether [she] has meaningful input into decisionmaking concerning the nature and scope of a major [] program."  *Armour*, 271 F.3d at

11

429 (citations and quotations omitted).

The parties, of course, disagree as to whether Galli's position with the Commission was policymaking. She alleges her job was not under the *Brown* factors because: (1) she did not enjoy decisionmaking authority with respect to personnel decisions (for though she was responsible for issuing performance evaluations for three employees under her direct supervision, she retained no power to hire, fire, or discipline staff); (2) her budget role was that of a low-level drone, preparing no more than informational forms that were subject to review by the Commission's Chief Financial Officer and to ultimate approval by its Board; (3) she could not enter into contracts for goods or services and was required to obtain prior approval from the Executive Director and the Board before implementing any policies or plans; and (4) execution and implementation of policy decisions rested with the Board, with her role allowing only the offer of information to her superiors.

The Commission maintains that Galli's responsibilities included: supervising and managing a thirteen-person staff; developing, sponsoring, and presenting resolutions to the Commission to be adopted as policy; developing and implementing environmental education programs for school groups and the general public; preparing a budget; recommending the hiring, promoting, and terminating of employees (along with preparing the evaluations that accompany these tasks); managing the construction of an

environmental museum; and communicating with government officials, as well as public and private organizations, regarding the Commission and its programs. Given these responsibilities, the Commission alleges that Galli had significant authority in managing the Environmental Education Division and contributed to policy development; therefore, her job was a policymaking position for which a political affiliation requirement was appropriate.

In deciding whether Galli established a *prima facie* case at the summary judgment stage, the District Court must draw all factual inferences in favor of her. *See, e.g.*, *Hugh*, 418 F.3d at 267. With respect to the central issue under *Brown*—namely, whether Galli had meaningful input into decisionmaking—the scope of her actual influence and authority in this area is in dispute. As such, the District Court was correct in concluding that, with regard to the first prong of her political discrimination claim, Galli sustained her burden of putting forward evidence that political affiliation was not a requirement for her position sufficient to defeat summary judgment on this element.

2.      *Constitutionally Protected Conduct*

The second hurdle for a *prima facie* political patronage discrimination claim is for Galli to show that she "engaged in constitutionally protected conduct." *See, e.g.*, *Stephens*, 122 F.3d at 176. Our Court sometimes has described this as a requirement that "the employee maintain [] an affiliation with a

13

political party." *See, e.g.*, *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 663–64 (3d Cir. 2002). However, the constitutionally protected activity here is broader than the act of joining a political party. Indeed, "[t]he threat of dismissal for failure to provide [] support [to the party in power] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise." *Elrod*, 427 U.S. at 359. In other words, the right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party. *See Branti*, 445 U.S. at 519 (holding that continued public employment "cannot properly be conditioned upon . . . allegiance to the political party in control").

Accordingly, we have held that a plaintiff can meet the second prong of a *prima facie* political discrimination claim if she suffers because of active support for a losing candidate within the same political party. *See, e.g.*, *Robertson v. Fiore*, 62 F.3d 596, 600–01 (3d Cir. 1995). In addition, we have ruled that the First Amendment also protects an employee from discrimination for failure to support the winning candidate. *See Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987) (stating that "a citizen's right not to support a candidate is every bit as protected as his right to support one," and quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984), for the proposition that "[f]reedom of association . . . plainly presupposes a freedom not to associate"). Finally, and most

14

relevant here, we have suggested that the First Amendment protects an employee's failure to engage in any political activity whatsoever. *Bennis*, 823 F.2d at 727 n.4 ("[W]e [] reject [the] suggestion [] that plaintiffs' alleged associations . . . *necessarily* had to be political in order to be entitled to [F]irst [A]mendment protection." (emphasis in original)).[3]

Despite this protection for constitutionally protected First Amendment activity, the District Court nonetheless concluded that Galli had no constitutional interest at stake because she did not affiliate with a political party and was apolitical. It held that Galli's silence was not a form of expression, as it was "simply

---

[3] District courts in our Circuit similarly have concluded that the First Amendment protects against discriminatory employment action targeting public employees who are politically neutral or apolitical. *See Raniero v. Antun*, 943 F. Supp. 413, 422 (D.N.J. 1996) (holding that "disinclination to become involved with [protected activity] is protected by the First Amendment," and citing *Rutan*, 497 U.S. at 67); *Christy v. Pa. Turnpike Comm'n*, 904 F. Supp. 427, 430 (E.D. Pa. 1995) (citing *Bennis*, 823 F.2d at 731, for the proposition that "the right not to politically associate is [] protected"); *Conjour v. Whitehall Township*, 850 F. Supp. 309, 317 (E.D. Pa. 1994) (stating that "the fact that [a public employee] was not politically active . . . is not dispositive of [his] First Amendment claim" because *Bennis* interpreted the *Elrod-Branti* doctrine to protect against "demotions or terminations carried out to make room for political supporters").

a lack of interest" in politics, which is unprotected by the First Amendment. The Court also found it persuasive that Galli was neither compelled to participate in the Democratic Party nor forced to keep her true beliefs to herself.

This misreads our interpretation of the *Elrod-Branti* doctrine. A citizen's right not to support a candidate is just as relevant for First Amendment purposes as her right to support one. *Bennis*, 823 F.2d at 731. This applies to public employees as well. Indeed, adverse employment actions taken against public employees merely "to make positions available for political supporters" could amount to political discrimination. *Id.*; *see also Conjour*, 850 F. Supp. at 317. Therefore, contrary to the conclusion of the District Court, Galli's failure to support the McGreevey campaign or the Democratic Party—even if because of a general apathy toward, or disdain for, politics—is constitutionally protected under the First Amendment.

That Galli was not pressured or forced to support the McGreevey administration or the Democratic Party, or even to silence her true beliefs, does not strip her constitutionally protected interest vested here. "[T]here is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance." *Branti*, 445 U.S. at 517. In this context, the District Court improperly imposed on Galli a coercion requirement in order to find that she established a constitutionally protected interest.

16

Our dissenting colleague faults our analysis on the second prong for relying on "*dicta*" in decisions of the Supreme Court and our Court. With regard to *Elrod* and *Branti*, however, our colleague appears to quarrel with the breadth with which the Supreme Court stated its own holdings. *See Elrod*, 427 U.S. at 350 (stating that the question presented was "whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or *nonaffiliation* state a claim for deprivation of constitutional rights," and holding that the plaintiff public employees could not be discharged "solely for the reason that they were *not affiliated* with or sponsored by the Democratic Party") (emphasis added)); *Branti*, 445 U.S. at 519 (reaffirming *Elrod*'s plurality holding and holding that "the continued employment of an assistant public defender cannot properly be conditioned upon his *allegiance to the political party in control of the county government*") (emphasis added)).[4] Even if what we read as the holdings of *Elrod* and *Branti* could be characterized as *dicta* and therefore not binding on us, such *dicta* are highly persuasive. Indeed, with regard to statements made by the Supreme Court in *dicta*, "we do not view [them] lightly." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 561 (3d Cir. 2003). Because

---

[4]Interestingly, our colleague turns to statements in Justice Stewart's dissent in *Branti* (rather than the majority's opinion) in an attempt to define the scope of the Court's holding. Dis. Op. at 13.

17

the "Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket," failing to follow those statements could "frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there." *Id.* (quoting *In re McDonald*, 205 F.3d 606, 612-613 (3d Cir. 2000)). To ignore what we perceive as persuasive statements by the Supreme Court is to place our rulings, and the analysis that underlays them, in peril.

Likewise, while we are not bound by our Court's prior *dicta*, we give such statements respect consistent with their persuasive value, *see McLeod v. Hartford Life and Accident Ins. Co.*, 372 F.3d 618, 628 (3d Cir. 2004), and "can, of course, accord dicta as much weight as we deem appropriate," *New Castle County v. Nation Union Fire Ins. Co. of Pittsburgh*, 174 F.3d 338, 345 n. 7 (3d Cir. 1999). We acknowledge that our Court in *Bennis* reached issues, including the nonaffiliation issue, that were unnecessary to its conclusion in order to provide guidance to the District Court on remand. 823 F.2d at 730. Nonetheless, we deem its analysis persuasive and adopt the path it suggests.

*Dicta* versus holding aside, *Elrod*, *Branti* and *Bennis* all stand for the proposition that a public employee, not in a policymaking position, may not be fired for failing to support the political party or candidate in power. Galli has presented

18

some evidence that she did not politically support the Democratic Party or Governor McGreevey. Whether her failure to support is evidenced by a decision to support a competing candidate or party, or by a decision to be apolitical and support no candidate or party, it is constitutionally protected.[5]

Because political unaffiliation, or "failure to support" the official or party in power, creates a constitutionally protected interest under the First Amendment, the District Court erred in finding that Galli did not establish this prong of her *prima facie* case.

---

[5]Our colleague's suggestions that a "failure to support" must be "close to a refusal" to support, Dis. Op. at 35, and that by deciding to be apolitical Galli was not really "exercising" her rights, Dis. Op. at 36, are inconsistent with well-settled First Amendment understandings. As the Supreme Court stated in *Wooley v. Maynard*, 430 U.S. 705 (1977):

> [T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. . . . A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right *to decline to foster such concepts*.

*Id.* at 714 (emphasis added). To read the First Amendment in the current context as protecting only party affiliation or active political activity is, in our view, to read the constitutional protection at issue too narrowly.

19

### 3. *Substantial or Motivating Factor*

Finally, Galli must establish that her constitutionally protected conduct was a "substantial or motivating factor" in the Commission's adverse employment action. *See, e.g.*, *Stephens*, 122 F.3d at 176. "[I]mplicit in th[is] prong is a requirement that the plaintiff produce sufficient evidence to show [that] the defendant knew of [the] plaintiff's political persuasion," which requires proof of both knowledge and causation. *Goodman*, 293 F.3d at 664. Thus, Galli must produce evidence tending to show that the Commission knew she was not a Democrat or supporter of the administration and fired her as a result. *Stephens*, 122 F.3d at 177.

### a. Knowledge

The District Court concluded that the Commission did not know enough of Galli's political affiliation to incur liability because she did not make her political proclivities known and her supervisors and colleagues did not make any inquiries about her political views. But this inquiry does not depend on whether Galli made her political views known to the Commission; rather, it is whether the Commission was aware that Galli failed to show public support for its officials and the political party in power. Here, Galli has offered ample evidence to bolster her claim that the Commission did not consider her to be a supporter of the current administration or party in power. For example, Galli's deposition testimony indicates that, following her

20

termination, Commissioner Nissley allegedly stated that the Commission was "letting Republicans go," that "some Democrat [obviously] wants the spot," and that one has to "pay to play with this administration." App. at Pa-431–33. These statements permit an inference that the Commission did not perceive Galli to be a supporter of McGreevey's administration or affiliated with the Democratic Party.

Galli also has provided support for her claim that other politically motivated terminations occurred alongside her own. Indeed, Executive Director Ceberio acknowledged that he knew that Galli, as well as the other ten members discharged from the Commission, were all appointed or hired during Republican administrations, which supports her allegation that employees who were politically unconnected to the McGreevey administration were forced out. In addition, Galli submits that she and the other unaffiliated or Republican-appointed employees who were discharged were replaced by eighteen employees who were affiliated with the McGreevey campaign or Democratic Party in some way. This supports the contention that knowledge of Galli's failure to support the administration was a substantial or motivating factor in her (and the other employees') termination.

Viewing the facts in the light most favorable to Galli, as we must at the summary judgment stage, a jury could conclude that the Commission believed that she was not supportive of the McGreevey administration. This satisfies all the knowledge

21

required for Galli to make her case.

b.      Causation

Because the District Court found that the Commission did not know of Galli's lack of support for the McGreevey administration, the Court did not consider the causation element of the *prima facie* test.  Before us, the Commission argues that the cause for Galli's termination was her poor performance, not her lack of political affiliation.  It singles out Galli's ostensible mishandling of a new museum project, which it alleges was over-budget, delayed, and ultimately removed from Galli's scope of authority.  In addition, the Commission submits that a Commission-wide reorganization, initiated to increase the organization's efficiency and economic health, triggered the terminations that Galli claims were politically motivated.

To demonstrate causation, Galli argues that her successor, and those replacing her terminated colleagues, were unqualified Democrats who were active in the McGreevey campaign or the Democratic Party.  She specifically highlights Mercurio's lack of qualifications for the position Galli held, noting that Mercurio formerly was a tax attorney with no background in environmental issues.  What Mercurio did do, however, was run on the Democratic ticket twice, at the urging of the party, in races that she was widely expected to lose.  In addition, Galli points out the odd timing of her discharge and Mercurio's hiring, alleging that Mercurio was offered Galli's job

22

before the latter was even informed of her termination. Galli also disputes the Commission's allegations of poor work performance, claiming that she never received negative feedback from her superiors, even at the time of termination; indeed, as mentioned above, the Environmental Education Division's work under Galli's leadership garnered an award of excellence that was, ironically, bestowed shortly after she was fired. Finally, Galli submits that the supposed reorganization of the Commission, allegedly undertaken to promote economic efficiency, was not only curiously undocumented, but also undermined by its decision to hire even more employees (eighteen) than it fired (eleven) in the name of streamlining.

Once again, viewing the facts in the light most favorable to Galli, it would be premature to grant the Commission summary judgment on the causation issue. Because Galli's evidence contradicts the Commission's allegation that her work performance was subpar, and because she offers evidence from which a reasonable juror could conclude that her lack of political affiliation was a substantial factor in her termination, Galli has alleged enough to proceed with her causation theory and, therefore, has established the third prong of her *prima facie* claim.[6]

---

[6]We are perplexed by our colleague's suggestion that our decision somehow discourages political participation. He posits that an individual may decide not to join a political party because government officials may be reluctant to hire that

23

## IV. Conclusion

We hold that the First Amendment protects politically neutral or apolitical government employees from political patronage discrimination. In addition, we conclude that Galli put forward sufficient evidence to create an issue of material fact regarding whether the Commission knew of her political unaffiliation and fired her because of it. We, of course, make no prediction as to whether Galli will succeed in her claim, but we are satisfied that she has presented a *prima facie* case. As a result, we vacate the District Court's grant of summary judgment to the Commission, as well as to Commissioner Levin, and remand this case for further proceedings.

---

person to replace an apolitical employee for fear of litigation. Such fear and reluctance would be unfounded. It is not enough for a non-policymaking apolitical employee simply to show that she was replaced by someone with a party affiliation; to make a *prima facie* case, an employee must present evidence that her failure to support the party or candidate in power was a "substantial or motivating factor" in the adverse employment decision. Galli has sustained that initial burden in this case.

Galli v. New Jersey Meadowlands Commission

No. 05-4114

---

BAYLSON, District Judge, dissenting.

I respectfully dissent from the majority's opinion and would affirm the grant of summary judgment to the Defendants, because controlling decisions of the Supreme Court, and prior decisions of this Court, do not compel the result reached by the majority. The decision in this case is an unwise extension of the scope of constitutionally-based but judicially created protection from politically motivated adverse employment decisions, to which state employees are entitled.

It is undisputed that Galli did not have any political party affiliation, and kept her political beliefs, if any, to herself. Under these facts, to grant Galli the same protection against adverse employment action that prior decisions have granted to politically active public employees, ignores the fundamental nature of the constitutional right being protected. Under the holdings of the Supreme Court and this Court, a public employee who *exercises* his or her political beliefs may not be punished for doing so. The majority, however, relies exclusively on dictum. Indeed, in this area of the law, like a

25

cloud enshrouding a skyscraper, dictum has disguised the actual holdings of the case precedents.  The public employee who chooses to remain non-political, or apolitical, or silent, has, by definition, not "exercised" political rights and therefore cannot claim the same constitutional protection from adverse employment decisions.

In the pages that follow, I will first demonstrate that the specific holdings of the Supreme Court's precedents, and our own precedential opinions in this area, do not require the result reached by the majority, and that the District Court's grant of summary judgment was correct under the undisputed facts and controlling law.  I will then show that the majority's extension of current law will pose many difficulties to litigants and district judges trying to apply this new rule, and that it is not wise on policy grounds.

I recognize that the result of this analysis will necessarily appear unfair to the discharged employee. However, the result reached by the majority, which essentially promises lifetime job protection to any apolitical state employee who is able to persuade a jury that an adverse employment decision was a result of politics – however vague that standard sounds, and it is a vague standard – puts courts in the unenviable, and improper, position of delving into First Amendment activity and beliefs, and whether such protected conduct was the motive for an employment action.  Although Congress or a state legislature could clearly give courts that

power, we judges should not give it to ourselves.

I.      **The Majority's Result Is Not Required by Precedent**

        A.      **Supreme Court Decisions**

        The Supreme Court first outlined a balancing test weighing the First Amendment rights of government employees against the State's interest as an employer in *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Of importance was the citizen's interest, not just an abstract interest in the freedom to speak, but rather the freedom of public employees to engage in open public debate on subjects of public concern balanced against the government's interest in the effective and efficient provision of public services.  *Id.* at 568.  In *Pickering*, a public school teacher in Illinois was dismissed after writing a letter critical of the school board and superintendent for the handling of a bond issue and subsequent allocation of financial resources between academic and sports programs, and sued, alleging a violation of civil rights.  *Id.* at 566.  Recognizing the impracticality of constructing a general standard, the Court nevertheless indicated the "general lines along which an analysis of the controlling interests should run."  *Id.* at 569.

        The Court first looked to what impact Pickering's letter may have had on the efficient running of the schools.  Two

27

important factors weighed against the school board on this point. First, to the extent the letter contained truthful statements on matters of public concern, it criticized the School Board and the superintendent, people with whom Pickering had no regular direct communication. As such, there was no threat to workplace discipline or harmony resulting from his criticism. Thus, that the statements were critical in tone could not justify Pickering's termination. *Id.* at 570. Second, as to the false statements in the letter, the Court noted the apathy with which the public greeted it. *Id.* at 570-571. Rejecting the School Board's claim that the false statements were harmful per se,[7] the Court expressly distinguished between "the Board members' own interests with that of the schools." *Id.* at 571. With this in mind, the Court characterized Pickering's criticism as a difference of opinion on how public money should be spent on the public school. *Id.* Moreover, since the letter was published *after* the bond issue had been approved, Pickering airing his opinion

---

[7]Just as the Court disagreed with Pickering that the normal defamation standard should apply to him, only holding him liable for statements which he knew to be false, or the falsity of which he recklessly disregarded, *Pickering*, 391 U.S. at 569, the Court also did not credit the School Board's analogy to the law of libel. *Id.* at 570-571. While the reasoning for this is only expressed in the discussion of Pickering's defamation argument, it seems to apply to both situations; namely, the competing interests of public employee as citizen and government as employer must be balanced.

28

could not have prevented the School Board from acquiring and using the funds as it saw fit. *Id.*

After reviewing the case from the perspective of the School Board's interests as employer – and finding little to support the Board's position – the Court moved to the other side of the scale: the constitutional and democratic values at stake in limiting speech. Here, the Court focused on the value the public derives from allowing open debate. When it comes to the administration of public schools, "free and open debate is vital to informed decision-making by the electorate." *Id.* at 571-572. Moreover, "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent." *Id.* at 572. Thus, it is the interest of the public in free speech that determines the balance in the *Pickering* test. *Id.* ("Accordingly, it is essential that [teachers] be able to speak out freely on such questions without fear of retaliatory dismissal.")

The first Supreme Court case specifically addressing allegedly politically motivated dismissals is *Elrod v. Burns*, 427 U.S. 347 (1976). The district court had granted a motion to dismiss the complaint under Rule 12(b)(6), so the factual setting was confined to the well-pleaded allegations of the complaint. The facts alleged in the complaint concerned employees within the Cook County, Illinois Sheriff's Office, who claimed that they were all Republicans and had been

29

discharged, or threatened with discharge, because the incoming elected Sheriff of Cook County was a Democrat, and in accordance with long-standing practice, when the elected Sheriff was of a different political party than his predecessor, all the employees not of the same political party as the Sheriff were discharged.

Although *Elrod* is often cited for the proposition that political patronage dismissals are unconstitutional under the First and Fourteenth Amendments, the actual holding is more limited. The plurality opinion[8] first notes that the question to be decided was as follows:

> This case presents the question whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.

*Id.* at 349. However, it can be immediately seen that dictum, with the reference to "nonaffiliation," has crept into the plurality opinion, because it is clear from the facts that all of the plaintiffs alleged that they were Republicans, and thus

---

[8]The plurality opinion in *Elrod* was authored by Justice Brennan, on behalf of himself, and Justices Marshall and White.

admittedly had political affiliation.[9]

Justice Brennan begins his analysis by identifying "the constitutional limitations implicated by a challenged governmental practice." *Id.* at 355. As in *Pickering*, although not explicitly relying on that decision for the point, the import of restrictions on belief and association lies in the fact that "[t]he free functioning of the electoral process also suffers." *Elrod*, 427 U.S. at 356 ("Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant."). Thus, the reason for safeguarding public employees' rights to free speech and association derive from "our profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." *Id.* at 357 (quoting *N. Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

---

[9]The plurality opinion recited these facts:
> In December 1970, the Sheriff of Cook County, a Republican, was replaced by Richard Elrod, a Democrat. At that time, respondents, all Republicans, were employees of the Cook County Sheriff's Office. They were non-civil-service employees and, therefore, not covered by any statute, ordinance, or regulation protecting them from arbitrary discharge.

427 U.S. at 350.

The plurality's opinion looked at this practice of political patronage, finding it unnecessary to efficient governance and an affront to democratic values:

> In summary, patronage dismissals severely restrict political belief and association. Though there is a vital need for government efficiency and effectiveness, . . . [t]hat interest can be fully satisfied by limiting patronage dismissals to policymaking positions. . . . More fundamentally, however, any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on the First Amendment freedoms."

*Id.* at 372-373.

However, it is important to recall that the above statement only represented the views of a three-judge plurality. Justice Stewart, joined by Justice Blackmun, concurred in the judgment in a five-sentence opinion, as follows:

> Although I cannot join the plurality's wide-ranging opinion, I can and do concur in its judgment. This case does not require us to consider the broad contours of the so-called

patronage system, with all its variations and permutations. In particular, it does not require us to consider the constitutional validity of a system that confines the hiring of some governmental employees to those of a particular political party, and I would intimate no views whatever on that question. The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge upon the sole ground of his political beliefs. I agree with the plurality that he cannot. *Perry v. Sindermann*, 408 U.S. 593, 597-598 (1972).

*Elrod*, 427 U.S. at 374-375 (Stewart, J., concurring).[10]

*Elrod*'s broad plurality statement, "we hold, therefore, that the practice of patronage dismissal is unconstitutional under the First and Fourteenth Amendment," is not the holding of a majority of the Court. In any event, the discussion shows that the plurality was focusing on individuals whose political views were well known and/or had engaged in political activity.

---

[10]*Perry* holds that a state government may not deny a benefit to a person on a basis which infringes a constitutionally-protected interest.

33

*Elrod* recognized that there must be a distinction for policymaking employees, which exception itself points out necessary limits of the judicial exercise into defining the scope of the constitutional right being protected. The exception carved out for policymaking officials provides the balancing-test formulation of the rule. Clearly weighing some governmental interests and allowing patronage-based hiring and firing for policymaking employees against the personal constitutional interests of those employees, the plurality stated, "The justification is not without force, but is nevertheless inadequate to validate patronage wholesale. Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end. Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Id.*[11]

Next, in *Branti v. Finkel*, 445 U.S. 507 (1980), a majority of the Court revisited and relied on both the plurality and concurring opinions in *Elrod*. Plaintiffs were two assistant public defenders who brought an action under the civil rights laws alleging that they were about to be

[11]I agree with the District Court and the majority that Plaintiff had presented sufficient evidence to require a trial on the issue of whether her position was policymaking or not. However, that question would not be reached if the district court's granting of summary judgment was proper on the grounds that plaintiff, as apolitical, was not entitled to protection under governing law.

discharged solely because they were Republicans. The district court entered a temporary restraining order to preserve the status quo, and then took evidence and made detailed findings of fact, following which it permanently enjoined the Public Defender of Rockland County, New York from terminating or attempting to terminate the plaintiffs' employment upon the sole grounds of their political beliefs. The district court made a specific finding that one plaintiff had been regarded as a Republican, notwithstanding a formal change of registration, and found that the plaintiffs "had been selected for termination solely because they were Republicans and thus did not have the necessary Democratic sponsors." *See* 445 U.S. at 510 (citing *Finkel v. Branti*, 457 F. Supp. 1284, 1293 (S.D.N.Y. 1978)).

In *Branti* the district court had found:

> The sole grounds for the attempted removal of plaintiffs were the facts that plaintiffs' political beliefs differed from those of the ruling Democratic majority in the County Legislature and that the Democratic majority had determined that Assistant Public Defender appointments were to be made on political bases."

457 F. Supp. at 1293 (cited at 445 U.S. at 510).

35

The six justice majority in *Branti* also relied on *Perry v. Sindermann*, as well as *Pickering*, and noted the two different opinions which constituted a majority of the Court in *Elrod*. The Court analyzed the contentions of the Public Defender which attempted to limit the holding of *Elrod*, but held that under *Elrod*, considering the opinions of both Justice Brennan and Justice Stewart, "the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs." *Branti*, 445 U.S. at 517-518. The Court then stated:

> In sum, there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance. To prevail in this type of an action , it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged "solely for the reason that they were not affiliated with or sponsored by the Democratic Party."

*Branti*, 445 U.S. at 517 (quoting *Elrod*, 427 U.S. at 350).

Although the broad nature of the above statement might seem to encompass an unaffiliated state employee such as Galli, it must be remembered that in the facts of *Branti*, as well as in the facts of *Elrod*, the political registration of the plaintiffs was well known, whereas in this case, it is

36

undisputed that Galli has no political registration, has not expressed any political views, and although registered to vote, she did not align herself as belonging to any political party.

The evidence in *Branti* discloses that when the Public Defender was appointed, he began instituting termination notices for six of the nine assistants in his office, including the two plaintiffs, and, as the Court stated, "With one possible exception, the nine who were to be appointed to be retained were all Democrats and were all selected by Democratic legislatures or Democratic town chairman on a basis that had been determined by the Democratic caucus." 445 U.S. at 509-510. The record also showed that the two plaintiffs were Republicans.

Like a bright moon against the dark sky, *Elrod* and *Branti* are distinctly in contrast to the present case, where Galli's political affiliation is completely unknown. The record in the present case does not contain any facts closely similar to those in *Elrod* or *Branti*. The record only shows that when she was originally hired in 1984, the government at that time was controlled by Republicans. (App. Pa. 14; 127.) There is no evidence about Galli's own political beliefs.

Maintaining the *Pickering* balancing test, the Court in *Branti* found that unless the government can demonstrate an overriding interest in doing so, it cannot rely on a person's private beliefs as "the sole basis for depriving him of

continued public employment." *Id.* at 515.  However, as Justice Stewart noted in his dissent, while the *Branti* majority characterized the case as dealing with private political beliefs, the public defenders were dismissed because of their public affiliation with the Republican party.  *Id.* at 522 n. * (Stewart, J., dissenting).  Thus, the specific facts of the two leading political patronage cases, *Elrod* and *Branti*, in which state employees with known political affiliations were ousted from their positions upon the election of a new administration, belie the broad language used by Justices Brennan and Stevens, respectively.

Furthermore, as in *Elrod*, examination of *Branti*'s other important holding, the refinement of the policymaker exception, reveals that patronage dismissal cases involve protecting the rights of speech and association for the benefit of the public, not merely to assert the primacy of First Amendment rights.  *Branti* redefined the policymaking distinction stating, "the ultimate inquiry is not whether the label 'policymaker,' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  *Branti*, 445 U.S. at 518.  Applying this standard, although a public defender implements policies, since those policies "relate to the needs of individual clients and not to any partisan political interests," the governmental interest of the effective performance of the public defender's job weighs

38

against patronage. *Id.* at 520-521. As in *Elrod*, the fact that patronage threatens the employee's rights to free speech and association serves as the reason for invoking the *Pickering* test.

The last of the Supreme Court's trilogy, *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), extended the rule of *Elrod* and *Branti* to other employment decisions based on political considerations, such as promotion, transfer, recall and hiring decisions involving low-level public employees. The opinion by Justice Brennan, in the first paragraph, specifically notes that these factors may not be "constitutionally based on party affiliation and support." *Rutan*, 497 U.S. at 65. There is no holding in the *Rutan* decision which would cover a state public employee such as Galli, who had no political affiliation and did not speak or act in any way in political matters.

The majority admits that the language in *Elrod* and *Branti* is broader than necessary for the outcomes, based on the facts of those cases. However, the majority fails to address the indisputable point that the facts of those cases, as well as the facts giving rise to subsequent Third Circuit precedent, reflect active political opposition on the part of the adversely affected employees, or at least some kind of affirmative choice not to affiliate with the political faction in power. Thus, the majority asserts the broad language in *Elrod* and *Branti* constitutes the essential holdings of those cases,

39

without acknowledging that such broad rights cannot emanate from the particular facts in either case.

The majority's treatment of *Elrod*, for example, emphasizes that "public employees could not be discharged 'solely for the reason that they were *not affiliated* with or sponsored by the Democratic Party.'" Maj. Op. at 17 (quoting *Elrod*, 427 U.S. at 350 (emphasis added in Majority Opinion)). Not mentioned by the majority, nor explained away, however, is the fact that the *Elrod* plaintiffs were registered Republicans, and were required by their employer to earn the sponsorship of a Democratic Party member to keep their jobs. *Id.* at 351.

The majority also ignores that the Supreme Court in *Elrod* and *Branti* did not have to discuss the employees' political activity and affiliation because they were not in dispute; therefore the Supreme Court focused on the type of job, and the employment actions taken by the government employer (as in *Rutan*). For instance, the government employer in *Branti* never argued that party affiliation does not constitute speech or association, but rather that party affiliation as a job requirement would not run afoul of what it considered to be *Elrod*'s ban against *coercing* a particular affiliation. *See Branti*, 445 U.S. at 512.

The majority defends its use of Supreme Court dicta. However, it is one thing for the Supreme Court to use its own

40

dicta to explain the rationale for its subsequent decisions, but it is another thing for a court of appeals to take Supreme Court dicta and use it to extend the precedents of both the Supreme Court and of this Circuit. Indeed, the reason appellate courts follow Supreme Court dicta is precisely so as not to "strike off on their own." *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) (quoting *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998)). Applying prior dicta to this case, with facts the Supreme Court has not addressed, would frustrate, rather than further, this goal. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 561 (3d Cir. 2003) (noting the admonition in *In re McDonald*, but stating, "[n]evertheless, we are satisfied that the case at bar is not the situation the [Supreme] Court's dictum anticipated.")

The majority relies on *Wooley v. Maynard*, 430 U.S. 705 (1977), to justify its interpretation of *Elrod* and *Branti*. A close inspection of *Wooley*, however, shows that it is no more helpful to illuminate the current issue than *Elrod* or *Branti*. Although *Wooley* was argued only four months after *Elrod* was decided, and the opinion issued within ten months of the *Elrod* decision, *Elrod* is not once mentioned in *Wooley*. The facts of *Wooley* reveal that the case has nothing to do with political patronage. In *Wooley* the appellees brought an action in federal district court to challenge the state of New Hampshire's requirement that all automobile licence plates carry the motto "Live Free or Die" while also making it a

41

misdemeanor to obscure any figures or letters on the plate, including the state motto. *Id.* at 707. Appellee Maynard was a Jehovah's Witness who objected to the content of the New Hampshire state motto on both religious and political grounds. *Id.* at 708. Pursuant to these beliefs, Maynard and his wife covered the motto as it appeared on their license plates. *Id.* at 707-08. Accordingly, the Supreme Court was "faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the purpose that it be observed and read by the public." *Id.* at 713.

*Wooley* relies heavily on *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), for its conclusion about the right to refuse to speak. In *Barnette*, the Court affirmed the district court's enjoining West Virginia from enforcing a law requiring students and teachers to recite the flag salute as to Jehovah's Witnesses, who claimed saluting the flag constituted an act forbidden by their faith. The form of silence protected by *Barnette* is purposeful rather than passive. *Wooley*'s own facts, as well as its reliance on *Barnette*, illustrates how factually distinct the present case is from precedent relied on by the majority.

## B. Third Circuit Decisions

### 1. Bennis v. Gable

42

In the case on which Judge Ambro most directly relies, *Bennis v. Gable*, 823 F.2d 723 (3d Cir. 1987), the plaintiffs had successfully challenged their demotion on the Allentown police force by a civil rights suit filed in federal district court, claiming they were demoted either in retaliation for supporting the mayor's political opponent, or in order to make room for the Mayor's supporters. Plaintiffs Bennis and MacLean were hired by the City of Allentown as police officers in 1974 during the administration of Mayor Daddona, a Democrat. *Id.* at 725. MacLean claimed to have known the mayor and his chief of police, Gable. Bennis claimed that his family had been neighbors and early supporters of Mayor Daddona. Both plaintiffs supported the Republican candidate for mayor in a successful bid to unseat Daddona in 1977. *Id.*

In 1979 Bennis was selected out of a pool of fifteen applicants for promotion to one of two detective-sergeant positions then available; MacLean was promoted to detective-sergeant in 1981 after assisting the detective bureau in a homicide investigation. *Id.* Also in 1981, Daddona obtained the Democratic nomination for the mayoralty, and was reelected in the November general election. *Id.* The plaintiffs claimed to have supported Dadonna's opposition in both the primary and general elections. *Id.* After the election Gable returned as chief of police, and at the direction of Dadonna he prepared recommendations for changes in the police department including demotions and reassignments. *Id.* at 726. Most of Gable's recommendations were accepted, and

43

of the nine recommended demotions, six were carried out.  *Id.*  Bennis and MacLean were among those demoted.  *Id.*

After a six-day trial, the district court instructed the jury that the plaintiffs had the burden to establish that their activity was entitled to First Amendment protection.  *Id.* at 727.  The district court also instructed the jury that the court had concluded that the activities engaged in by the plaintiffs were protected by the First Amendment as a matter of law.  *Id.*

On appeal, defendants challenged, *inter alia*, the district court's telling the jury "as a matter of law that the plaintiffs Bennis and MacLean engaged in protected first amendment activity" when they opposed Daddona in both the 1977 and 1981 campaigns, arguing that "the nature of the plaintiffs' alleged private conversations and associations, if any, were controverted questions of fact."  *Id.*  Plaintiffs responded that defendants had not properly raised this issue at trial so as to preserve it for appeal.  *Id.*  This Court held "the defendants' objection was sufficient to put the district court on notice that the *nature* of plaintiffs' activity, if *any*, was a disputed issue of fact," *id.* (emphasis in original), the district court had erred in telling the jury that plaintiffs had engaged in protected First Amendment activity as a matter of law, and remanded for a new trial.  *Id.* at 725.  Because the conflicting testimony as to the nature of plaintiffs' speech or conduct represented an issue of fact, the court's opinion stated, "[o]nly

44

after the jury had determined the nature and substance of the plaintiffs' alleged activity could the court decide its status as protected or unprotected." *Id.* at 729. After a careful reading of *Bennis*, its only holding is that the district court had "impermissibly trespassed upon the jury's fact-finding function . . . ." by concluding that plaintiffs had engaged in prohibited First Amendment activity. *Id.* at 725.[12]

Despite recognizing the narrowness of the issue before it, the court's decision opines on other issues. *See id.* at 730 ("Although our conclusion that the district court committed reversible error in its instruction on protected activity makes it unnecessary for us to reach many of the issues raised by the defendants, some of these issues are almost certain to recur on remand in the district court.").

The majority admits that the decision in *Bennis* "reached issues, including the nonaffiliation issue, that were unnecessary for its conclusion in order to provide guidance to the district court on remand." Maj. Op. at 18. Nonetheless, the majority relies on *Bennis* as support for its decision in this

_____

[12]*Bennis* holds that the protection against politically motivated dismissals established in *Pickering*, *Elrod*, and *Branti* extends to demotions, as were at issue in *Bennis*. *Id.* at 731. "As we read those cases, the constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible free speech." *Id.* (thus anticipating *Rutan*).

45

case. *Bennis* discusses whether defendants could have demoted the plaintiffs simply to make positions available for political supporters, rather than as retribution for the plaintiffs' active political opposition. Considering a demotion for such a reason as reflecting "a failure to support," *id.* at 731, the court stated, "A citizen's right not to support a candidate is every bit as protected as his right to support one." *Id.* (citing *Roberts v. United States Jaycees*, 468 U.S. 609 (1984)).[13] Judge Ambro relies on this quote, and a footnote in *Bennis*, to expand the concept of "failure to support" to include protection for apolitical employees. In relevant part, the footnote states:

> [W]e also reject the defendants' suggestions that plaintiffs' alleged associations were not political because the plaintiffs were opposing a fellow Democrat, and that the plaintiffs' associations *necessarily* had to be political in order to be entitled to first amendment protection. The first amendment protects the "right to associate with others in pursuit of a wide variety of political,

---

[13]*Bennis* continues with several other points which are of limited, if any, relevance to the present case on the particular subject of this memorandum. These are the appropriateness of the district court's charge that plaintiffs had to prove that politics was a 'substantial motivating factor' in their demotion, whether the defendants were entitled to qualified immunity, and the availability of punitive damages.

46

> social, economic, educational, religious, and cultural ends.' *Roberts v. United States Jaycess*, 468 U.S. at 622. Of course, only the right to associate for political purposes is at issue in this case.

*Bennis*, 823 F.2d at 727 n. 4. The sentence and footnote in *Bennis*, quoted above, were made in the context of plaintiffs who specifically alleged their own partisan political activity was the reason for their demotion. Indeed, the *Bennis* court expressly noted "only the right to associate for political purposes is at issue," and not the larger issue of nonpolitical speech or association. Thus, the statement and footnote, in the context of the *Bennis* facts and holdings, do not expand protections beyond actual speech or actual association for political purposes.

> In any event, such discussions are dictum.

> It is not everything said by a judge when giving judgment that constitutes a precedent. In the first place, this status is reserved for his pronouncements on the law . . . . The second reason . . . is that, among the propositions of law enunciated by him, only those which he appears to consider necessary for his decision are said to form part of the *ratio decidendi* and thus to amount to more than an *obiter dictum*.

47

*United States v. Warren*, 338 F.3d 258, 266 n. 5 (3d Cir. 2003).[14]

Although *Bennis* cites *Roberts*, *Roberts* does not hold or imply that silence is a First Amendment right protecting state employees from termination. That case involved a challenge by the United States Jaycees against the application

---

[14]The Third Circuit has clearly adopted a rule that dicta are not binding on courts. "As the Supreme Court noted in the course of its discussion of ancillary jurisdiction in *Kokkonen v. Guardian Life Ins. Co. of America*, '[i]t is to the holdings of . . . cases, rather than their dicta, that we must attend.'" *IFC Interconsult, AG v. Safeguard Intern. Partners, LLC*, 438 F.3d 298, 311 (3d Cir. 2006) (quoting *Kokkonen*, 511 U.S. 375, 379, (1994)); *Marianna v. Fisher*, 338 F.3d 189, 201 (3d Cir. 2003) ("It is also well established that a subsequent panel is not bound by dictum in an earlier opinion"); *Burstein v. Ret. Account Plan For Employees of Allegheny Health Educ. and Research Found.*, 334 F.3d 365 (3d Cir. 2003) ("[T]he language . . . on which the district court relied constitutes dictum, and therefore does not bind us."); *Gov't of Virgin Islands v. Fonseca*, 274 F.3d 760 (3d Cir. 2001) (discussion not part of the holding is dicta, and not precedential); *American Civil Liberties Union of New Jersey ex rel. Lander v. Schundler*, 168 F.3d 92, 98 n.6 (3d Cir. 1992) ("[W]e have repeatedly held that dicta are not binding." (citing *McGurl v. Trucking Employees*, 124 F.3d 471, 484 (3d Cir.1997); *United States v. Bennett*, 100 F.3d 1105, 1110 (3d Cir.1996); *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1071 (3d Cir.1990)).

of a Minnesota law barring discrimination on the basis of sex in places of public accommodation.  *See Roberts*, 468 U.S. at 612 ("This case requires us to address a conflict between a States's efforts to eliminate gender-based discrimination against its citizens and the constitutional freedom of association asserted by members of a private organization."). The Court identified "intrinsic and instrumental features of constitutionally protected association," concluding that the protections afforded freedom of association would differ in nature and degree, depending on whether freedom of "intimate association" or "expressive association" was implicated.  *Id.* at 618.  Finding the Jaycees to be an "expressive association," the Court held Minnesota's interest in eliminating discrimination outweighed the Jaycees' interest in its freedom not to associate with women.  *Id.* at 623.  The broad language in *Roberts* declaring, "[f]reedom of association therefore plainly presupposes a freedom not to associate," *id.*, does not refer to the freedom an individual has not to join a group, but rather the freedom a group has to deny membership to an individual or class of individuals.[15]  The

---

[15]In fact, the distinction drawn in *Roberts* between the intrinsic and instrumental features of association echoes the point made in *Branti* about the rationale behind denying protection from patronage dismissals to policymaking employees.  Indeed, to the extent that *Roberts* is relevant to the instant case at all, it is because the Supreme Court has determined that the freedom of expressive association which Galli asserts has been infringed is subject to greater restriction

49

case has nothing to do with protecting silent or apolitical state employees.[16]

---

than if she were to assert infringement of an intimate association.

[16]The Supreme Court has relied on *Roberts* for the appropriate test to apply to government interference in the membership of associations which are either "intimate" or "expressive". *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (citing *Roberts* for the proposition that "[g]overnment actions that unconstitutionally burden that right [of association] may take many forms, one of which is intrusion into a group's internal affairs by forcing it to accept a member it does not desire."); *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) (relying on the *Roberts* rule to deny Rotary International's right to exclude women from local clubs). This Court has understood *Roberts* similarly. *Forum for Academic and Institutional Rights v. Rumsfeld*, 390 F.3d 219 (3d Cir. 2004) (Ambro, J.) (employing *Roberts* to balance the right of an association to bar particular individuals or classes as part of the association's expressive agenda against a compelling state interest to infringe on that right); *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 339 F.3d 435 (3d Cir. 2000) (summarizing the *Roberts* distinction between intimate and expressive associations, describing protection of the former as a fundamental personal liberty and protection of the latter as an indispensable means of preserving other personal liberties); *Salvation Army v. Dep't of Comty. Affairs*, 919 F.2d 183 (3d Cir. 1990) (same); *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1998) (finding relationship between plaintiff and her brother-in-

50

## 2.    <u>Stephens v. Kerrigan</u>

In *Stephens v. Kerrigan*, 122 F.3d 171 (3d Cir. 1997) (reversing grant of summary judgment where the court finds question of material fact as to whether defendants knew of plaintiff police officers' political affiliations, and whether such knowledge was a substantial motivating factor in the officers' discharge), the district court framed the question before it as whether the City of Allentown and its officers impermissibly denied promotions to police officers who "openly opposed or failed to support" the candidacy of the eventual mayor of Allentown. *Id.* at 172. However, in reversing the district court's grant of summary judgment, the Third Circuit relied on evidence in the record indicating active support for one candidate or the other. As the court pointed out,

> In this case, there is evidence that the political affiliations of the members of the Police Department constituted more than workplace rumor; the heated and contentious debate over the endorsement of Heyd for Mayor drew clear lines between those who supported Heydt and those who did not.

_____

law does not represent an intimate association requiring protection).

51

*Id.* at 177.  Thus, notwithstanding the court's repetition of the dictum in *Bennis* that "a citizen's right not to support a candidate is every bit as protected as his right to support one," *id.* at 176 (quoting *Bennis*, 823 F.2d at 731), the facts of *Stephens* show that the police officers opposed the winning candidate.[17]

### 3.  Goodman v. Pa. Tpk. Comm'n

The most recent Third Circuit case on this topic is *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655 (3d Cir. 2002). In this political patronage case, the court upheld a jury verdict in favor of the plaintiff, as well as the district court's denial of defendants' motions for judgment as a matter of law and for a new trial.  *Id.* at 677-678.  The Third Circuit first summarized what it termed the Supreme Court's "trilogy" of political patronage cases, *Elrod*, *Branti* and *Rutan*, before recounting the three-prong test relied upon by the district court in the instant action:

> (1) that the employee works for a public agency in a position that does not require a political affiliation, (2) that the employee maintained an affiliation with a political party, and (3) that the employee's political affiliation was a substantial

---

[17]The legal standard articulated in *Stephens* is discussed below.

or motivating factor in the adverse employment decision.

*Goodman*, 293 F.3d at 663 (quoting *Robertson v. Fiore*, 62 F.3d 596 (3d Cir. 1995)).

The *Goodman* decision examines at length admissibility of certain evidence. However, the ultimate legal issue before the court was whether the plaintiff had adequately proved his case at the *third* prong of the test. That is, the issues were whether Goodman had proven defendants had knowledge of his political affiliation, and whether such knowledge was the reason for denying him a promotion. *See id.* at 670-75. There was no dispute, however, that Goodman was a registered, active Democrat, whose family was engaged in a political rivalry with a Republican State Senator, and opposed Republican candidates generally. *See id.* at 661, 672. The court relied on plaintiff's party affiliation as supporting the sufficiency of plaintiff's intent in challenging an adverse employment action as the result of improper political patronage.

The above discussion, necessarily detailed, should demonstrate that precedent does not require the result reached by the majority.[18] Thus, treating the question presented as one

[18]The majority does correctly cite a number of district court opinions within this Circuit which have concluded that public

53

of first impression, do the applicable legal principles require affirmance?

## II.     **The District Court Correctly Followed Controlling Precedent**

The District Court relied on this Circuit's precedent, i.e., *Goodman*, 293 F.3d at 663, for the above-quoted standard of the elements necessary to make out this claim. *Goodman* relies on a prior decision of this Circuit, *Robertson v. Fiore*, 62 F.3d at 599, for this formulation and quotes it directly from *Robertson*. Although the majority cites *Goodman* in its opinion, *see* Maj. Op. at 13, the majority, rather than using the *Goodman* formulation of the test, instead quotes a significantly different, and broader, formulation from *Stephens v. Kerrigan*.

Specifically, the second element, although quoted in *Goodman* as requiring the plaintiff to show "that the employee maintained an affiliation with the political party" is characterized in *Stephens* as the plaintiff must only show "she was engaged in constitutionally protected conduct." *See Stephens*, 122 F.3d at 176, and quoted in the majority's

employees who are not affiliated with any political party enjoy protection against discriminatory employment actions. *See* Maj. Op. at 15 n.3. However, all of these cases rely on the dictum in *Elrod*, *Branti* and/or *Bennis* for this result.

54

opinion. Maj. Op. at 13. The majority could not and does not criticize the District Court for quoting the elements of the claim as stated in *Goodman*, but the majority mysteriously avoids using the *Goodman* standard, even though *Goodman* is this court's most recent precedential holding on this topic.

The *Stephens* reference to "constitutionally protected conduct" also cites *Robertson*, but this language will not be found in *Robertson*. Research shows *Stephens* introduced the broad phrase "constitutionally protected conduct" as the second prong without any precedential support.[19]

_____

[19]Stephens cites, in addition to *Robertson*, *Rode v. Dellarciprete*, 845 F.2d 1195, 1200 (3d Cir. 1988), and *Laskaris v. Thornburgh*, 733 F.2d 260, 265 (3d Cir. 1984), *cert. denied*, 469 U.S. 886 (1984)). Although involving First Amendment rights to speech and association, *Rode* is not a political patronage case at all. The plaintiff's free speech claim stemmed from alleged retaliation by the police department which employed her for statements she made during an interview with a journalist, and the association in question was with the plaintiff's brother-in-law. *See Rode*, 845 F.2d at 1199. In this sense, *Rode*'s only real relevance to the issue of political patronage is that it also employs the *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977), standard, requiring that the protected conduct in question play a substantial or motivating factor in the government's choice to impose the employment action in question. *See Rode*, 845 F.2d at 1200 (citing *Mt. Healthy*, 429 U.S. 274). In *Laskaris*, a directed verdict for the defendants was upheld because the court

55

Nonetheless, the majority opinion proceeds with the standard as stated in *Stephens* as the standard to be applied, which is a gigantic leap in doctrine, but which I have demonstrated is without any precedential support whatsoever. That language ("constitutionally protected conduct") was not necessary to the *Stephens* holding, because that case determined that the plaintiff, involved in an intra-party dispute, was entitled to the protection of the *Elrod/Branti* rule, because he was himself politically affiliated, just as Messrs. Elrod, Branti and Rutan, as well as all the other plaintiffs in our own cases, were politically affiliated. Thus, the language of *Robertson* was sufficient to support the holding in *Stephens*, without the *Stephens* opinion changing the specific words of the second element of the claim.

The majority attempts to justify its adoption of the broader standard in the following language:

_____

determined the plaintiffs had failed to adduce any evidence which could lead the jury to conclude the defendants had any knowledge of the plaintiffs' political affiliations. *Laskaris*, 733 F.2d at 265 ("Without that knowledge [that plaintiffs were Democrats] as a predicate, the fact that Diehl, who was a Republican, replaced Laskaris, cannot by itself support an inference that Laskaris's discharge was politically motivated.") *Laskaris* extends the *Elrod-Branti* rule and concludes "[f]irst amendment rights are not less violated if political affiliation is not the 'sole' reason but only a 'substantial' factor in the decision." *Id.* at 265.

56

Our Court sometimes has described this as a requirement that "the employee maintain [] an affiliation with a political party." *See*, *e.g. Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 663-64 (3d Cir. 2002). However, the constitutionally protected activity here is broader than the act of joining a political party. Indeed, "[t]he threat of dismissal for failure to provide [] support [to the party in power] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise." *Elrod*, 427 U.S. at 359. In other words, lack of allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party. *See Branti*, 445 U.S. at 519 (holding that continued public employment "cannot properly be conditioned upon . . . allegiance to the political party in control").

Maj. Op. at 13-14.

The only citation for this last proposition is a quote from *Branti*, which cannot support the majority's conclusion in this case because, as shown above, the facts of *Branti* concerned employees who were politically affiliated. The

57

majority opinion continues by asserting that this court's prior opinions in *Robertson* and *Bennis* are in accord with this proposition – but as the above discussion shows, the facts in those cases involve politically affiliated employees, and the language which the court cites is clearly dictum.

It is clear that if the majority had adhered to the requisites of the claim as described in *Goodman*, which was relied on by the district court, the result would be an affirmance.

The District Court reviewed the applicable Third Circuit principles as most recently established in *Goodman*. The second prong in *Goodman* is the requirement "that the employee maintained an affiliation with a political party." *See id.* at 663. Without citing any of the dictum in *Elrod* or *Bennis*, the District Court correctly noted "as to the second prong, there is no evidence in the record that plaintiff maintained an affiliation with any political party." The District Court then reviewed a number of citations from the record supporting this conclusion, and concluded "it is clear from these statements that plaintiff fails to satisfy the second prong of the standard – that is, plaintiff emphatically did not maintain a political affiliation." (App. Pa. 6-7.)

In footnotes, the District Court noted that plaintiff had vacillated between arguing that she was politically disinclined and that she had no political affiliation, and although there

58

may be conceptual differences between the two, they did not affect the District Court's opinion. The District Judge also cited cases to support the well known proposition that "historically, the First Amendment has been used to protect political speech, although also protecting silence," and concluding, "[i]n this instance plaintiff's silence is not a form of expression, protected or otherwise; it is simply a complete lack of interest in a topic. As a result, this court would have found it difficult to understand how plaintiff's silence and lack of interest in politics could be construed as political speech that requires the protection of the First Amendment." (App. Pa. 6-8, n. 2,3.)

The District Judge also correctly noted, corroborating my own research, "this court has been unable to locate any case that provides protection for a plaintiff who simply lacks an interest in politics." (App. Pa. 8.)

Despite the District Court's thoroughly accurate characterization of the record, and its reliance on the requisites of establishing a claim of this nature as recently restated in *Goodman*, the majority concludes that the District Court "misreads our interpretation of the *Elrod-Branti* doctrine," by, as noted above, citing dictum in *Bennis*. I respectfully suggest the extended discussion above shows it is the majority which has misread the precedents.

I also believe that the majority has improperly

characterized the facts in its statement at page 16 of the Majority Opinion, "Therefore, contrary to the conclusion of the District Court, Galli's *failure* to support the McGreevey campaign or the Democratic party – even if because of a general apathy toward, or disdain for, politics – is constitutionally protected under the First Amendment." (emphasis added).

To say that the facts show that "Galli's failure to support" McGreevey or the Democrats is misleading. The word "failure" has a negative connotation and evokes a conscious decision, close to a refusal, to become involved in taking the side of one party or one candidate versus another party or candidate. The District Court fully recognized that Galli had a constitutional right not to become involved in politics, but never used the words "failure to support" as does the majority.

The District Court made no equation of Galli's right to remain silent with a lack of proof that she failed to support McGreevey. The District Court was only noting that plaintiff's complete lack of interest in politics, by itself, demonstrated that she did not meet one of the elements of the claim as established in *Goodman*.

III.    **The Majority's Decision Is an Unwise Extension of Current Law**

60

Existing precedents correctly focus on public employees who have been demonstrably and voluntarily politically affiliated or active. The policy which the Supreme Court decisions adopted, not only focuses on the employees' *expression* of their First Amendment right that courts have protected, and rightly so, but also the interest of the public in allowing public employees to participate in politics without fear of losing their jobs. When a state employee, or any other citizen, chooses not to register to vote as a member of a political party, and chooses not to identify herself with any political organization, and keeps her political views to herself, as Galli, she is also within her rights and no one can force her to do otherwise.[20] However, it is a stretch, if not a fiction, to maintain that Galli is "exercising" her rights. In plain English, she is declining to exercise her rights. She cannot be denied the privileges of citizenship for this refusal. However, under the majority's rationale, her silence has been equated with political activity and the dominoes of litigation will thus start falling in favor of a new class of public employee plaintiffs who have no political activity, expression or affiliation, but who will be entitled to presumably permanent job protection if they can prove their job was given to someone else with political affiliation or support.

Such an extension of First Amendment protection

---

[20]The District Court appropriately cited the right of silence, with citation to *Barnette*, 319 U.S. 624.

61

should, in my opinion, be made by Congress rather than by judges.  The actual holdings of *Elrod*, *Branti*, *Rutan* and *Goodman* forbid adverse employment consequences because of the exercise of First Amendment political rights by the public employee.  Giving the word "exercise" as used in the First Amendment its plain meaning, surely one can see, through a constitutional prism, the difference between characterizing a public employee's loss of her job because of her exercise of her political beliefs as a civil rights violation, and reaching the same result for the public employee who eschews all things political, and has made no such "exercise."

This holding may motivate public employees, who want to hold on to their jobs, to avoid any political affiliation or involvement whatsoever, thus, emasculating a key purpose behind the origins of the *Pickering* rule, i.e., to protect and encourage political speech and debate by public employees.  In its quest to seek equality for all public employees, the majority equates the rights of the politically active public employee with the apolitical public employee.  Although this may appear to be superficially appropriate, it really ignores the fundamental policy concerns which led the Supreme Court down this path in the first place.  The majority has elevated job protection as a civil right, but in the process has pushed at least an equal, if not more important, civil right, the public interest in having public employees be involved in politics, into the background.

62

The reality is that many people undertake political activity because it will help them get a public employment job as a result of their political activity, i.e., political patronage. The downstream impact of the majority's holding may be to lessen political activity.

Congress has not hesitated to legislate where it decided that restrictions on the right to hire and fire were wise. It has enacted laws impacting the employment relationship, public and private, in a variety of contexts.[21] Cases arising under these laws consume a considerable share of the daily litigation diet in district courts. If an apolitical public employee's protection from job termination is wise and in the public interest, Congress should make that call, not this Court.

## IV.    The Majority's Decision Will Create Much Confusion Among Litigants and District Judges

---

[21]Family and Medical Leave Act of 1993, 42 U.S.C. § 2601 *et seq.*; Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; Labor-Management Relations Act, 1947, 29 § 141 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* As the Supreme Court stated in enforcing Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973), "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."

In *Robertson*, the court noted that the burden of proof in political discrimination cases requires a burden-shifting process similar to that in other employment cases. If the employee demonstrates the three elements as stated in *Robertson* and *Goodman*, the employer may avoid a finding of liability by demonstrating by a preponderance of the evidence that it would have made the same decision even in the absence of protected affiliation. *Mt. Healthy*, 429 U.S. 274.

In cases filed and litigated under the existing doctrine of the Supreme Court and this court, plaintiffs have had to prove some kind of political affiliation or activity, and as a result of that, they suffered an adverse employment decision. In most states, in order to vote in a primary election, a person must register with a political party. If this voter is interested in future public employment, the mere fact that the voter registered with the same political party as the incoming administration may mean that a lawsuit and jury trial may be necessary to determine if the administration's decision to hire the registered voter to replace an existing, apolitical employee, violated the latter's constitutional rights. Indeed, the effect may very well be to discourage political activity.

Why should a judge-made rule prevent, on pain (and considerable expense) of defending civil rights litigation, an incoming administration from replacing an existing employee who had voluntarily decided not to register with a political

party, with someone who was politically registered?  The court is inviting litigation over the motives of an incoming, or existing, governmental administration in replacing current apolitical employees with those who have been exercising their First Amendment right to politically affiliate or engage in political activity.  The evidence and the charge to the jury would require the parties and the jury to inquire into the motive of the decision-maker and whether the employment decision was made because of political considerations.  The seeming simplicity of this kind of inquiry is deceptive.  It is difficult enough for juries and judges to discover and adjudicate motive in the context of age or gender discrimination, which Congress has forbidden, but when the legal test touches upon the exercise and/or non-exercise of cherished, and sometimes privately held, political beliefs, which are constitutional rights, the majority is inviting a very intrusive examination into personal matters.  If a public employee has publically and openly expressed himself politically, then there is no intrusion.

The majority opinion leaves undecided how district court judges should interpret "constitutionally protected conduct" in the factual situation of a public employee who has no political affiliation or interest whatsoever.  Two conflicting constitutional rights are at play.  First, is the public employee's protected right to remain silent.  Second, other citizens have the right to have political affiliations and engage in political conduct.  Will post-trial review of a verdict for

65

sufficiency of the evidence require this court to assess the quantity and quality of political activity by replacement employees?   Will simple party registration without any political activity be enough to support a verdict that an employment decision was made solely because of party affiliation?  The shoals of litigation may never be more difficult to navigate, and courts may not emerge from this thicket with a rational test to promote the socially useful and valid exercise of important constitutional rights, i.e., the right to engage in politics.

By extending *Elrod*, *Branti* and *Rutan* job protection to those who are completely and totally politically inactive, the majority awards that protection to a previously unprotected class of public employees.  This may sound fair in principle, but because we judges are removed from the world of politics, we need to exercise restraint from making decisions which will impact the free flow of political discourse.

The dissent of Justice Scalia in *Rutan*, speaking also for Chief Justice Rehnquist and Justice Kennedy, and in part for Justice O'Connor, did not constitute a majority of the Supreme Court.  However, his conclusion, that if *Elrod* and *Branti* were correctly decided on their facts, they should not be extended beyond their facts, which he characterized as "actual discharge of employees for their political affiliation," *Rutan*, 497 U.S. at 114, has so far been adhered to by the Supreme Court.  The focus is properly on the political activity

66

of the current employee. This case should be the vehicle to clarify the unfortunate dicta in cases such as *Stephens* and *Bennis*, not expand them.

## V.    Conclusion

The majority has steered this court into new territory by the expansion of current law to protect the politically unaffiliated, and the questions above point out the difficulty of defining those parameters. One of the principal purposes behind protecting public employees from adverse employment actions based on political patronage is to balance the interests of government in the effective and efficient provision of public services with *public* interest in public employees participating freely in open debates about issues of public concern. The extension of these protections to one who chose not to engage in politics in any way is neither required by precedent nor warranted by the underlying justification for restrictions on patronage.

For the foregoing reasons, I respectfully dissent.